ARABIAN SHIELD DEVELOPMENT COMPANY, Appellant,

v.

Ray HUNT, Hunt Oil Company, Yemen Hunt Oil Company, M.A.M. Exploration, Inc., M.A.M. Int'l S.A., a Panamanian Corporation, and Moujib Al–Malazi, Appellees.

No. 05–89–00046–CV.

Court of Appeals of Texas, Dallas.

April 12, 1991.

Rehearing Denied May 21, 1991.

---

H. Dee Johnson, Jr., Dallas, for appellant.

Frank Finn, David R. Noteware, Stephen C. Rasch, Dallas, for appellees.

Before ROWE, LAGARD and OVARD, JJ.

## OPINION

OVARD, Justice.

This is a summary judgment case. The lawsuit arose from competition between two enterprises for petroleum exploration and production rights in the Safir Basin, in the nation of Yemen. In early 1981, representatives of Arabian Shield Development Company (Arabian Shield) and Dorchester International, Inc., entities related to Dorchester Gas Company, travelled to Yemen to negotiate an oil and gas concession with the Yemeni government and national oil company. At approximately the same time, the Hunt Oil Company (Hunt Oil) sought to acquire the same concession. The Yemeni government awarded the concession to Hunt Oil in August 1981. Arabian Shield and Dorchester International later began to suspect that Hunt Oil had used improper means to win the concession. They filed suit against Hunt Oil, Ray Hunt, and others on October 2, 1987, for tortious interference with an advantageous business relationship.

The trial court awarded Hunt Oil, Ray Hunt, and the other defendants summary judgment. The trial court did not disclose the basis for his ruling. As a result, we must uphold the summary judgment if any legally sufficient ground, pleaded by the defendants, supports it. *Langston v. Eagle Publishing Co.*, 719 S.W.2d 612, 615 (Tex.App.—Waco 1986, writ ref'd n.r.e.). We hold that the trial court properly could have granted summary judgment based upon the running of the statute of limitations. Consequently, we affirm the summary judgment.

## FACTS AND PROCEDURAL HISTORY

### THE PRIZE

The Safir Basin is a geologic formation capped by a salt dome in the Ma'arib region of the Yemen Arab Republic (Y.A.R.) (now reunited with the People's Democratic Republic of Yemen). A few petroleum geologists did preliminary surveying work in the area during the late 1950s, but civil war and the area's primitive infrastructure prevented petroleum exploration. By 1980, the government of the Y.A.R. had pacified the region and had paved a road from Sana'a, the capital, to the city of Ma'arib. The government also had commissioned an aeromagnetic survey of the Ma'arib region. The survey suggested the existence of a thick layer of sedimentation beneath the Safir Basin. A thick sedimentary layer capped by a salt dome could contain commercial quantities of petroleum. The Yemeni government began searching for an oil exploration company to prospect in the region.

### THE RACE

In 1980, Hunt Oil Company wanted to expand overseas operations. It contacted Moujib al-Malazi (al-Malazi) to help find prospects. In October 1980, al-Malazi traveled to Sana'a, on behalf of Hunt Oil, and met with the Prime Minister of the Y.A.R. and with officials of Yominco, the Yemeni national oil and mineral company. The Yemeni government showed al-Malazi the aeromagnetic survey and told him that the government sought a production sharing agreement with a suitable oil company. Al–Malazi met with chief corporate officers of Hunt Oil, including Ray Hunt, the President, in Dallas in December 1980. Hunt

Oil decided to pursue a concession in the Y.A.R. In January 1981, a delegation from Hunt Oil visited the Y.A.R. They met with Ali Jabr Alawi (Alawi), the Director General of Yominco, and with Ali Abdul Rahman al-Bahr (al-Bahr), Minister of State. Alawi visited Dallas in February 1981, at the invitation of Hunt Oil. After Alawi returned to Sana'a, Hunt Oil sent a telex stating that it wished to pursue negotiations and would submit a proposal before April 1, 1981.

Arabian Shield also sought an exploration and production sharing agreement with the Yemeni government. Executives of Arabian Shield had long known of the existence of the Safir Basin. Jack Crichton, Chairman of the Board of Arabian Shield, had tried to negotiate exploration agreements in the Y.A.R. in the 1950s, before civil war made exploration impossible. The President of Arabian Shield, Hatem El–Khalidi, a geophysicist, performed survey work in the Safir Basin in 1956–57. Arabian Shield had experience extracting hard minerals, but it had never drilled for oil. However, Arabian Shield was a spin-off of Dorchester Gas Company (now Dorchester Master Limited Partnership), a large, public company with wide experience in oil and gas exploration. Dorchester International, a company closely associated with Dorchester Gas, formed a joint venture with Arabian Shield to procure the concession in the Safir Basin. The Arabian Shield/Dorchester group hired as business agent Shaher Abdulhak, a resident of Sana'a. The joint venture provided Abdulhak documents containing geological studies of the Safir Basin and asked him to begin preliminary negotiations.

On February 24, 1981, Dale Chase, President of Dorchester Gas, Crichton, of Arabian Shield, and Abdulhak met formally with Minister al-Bahr in Sana'a and presented their proposal. Two days later, Crichton, Chase, and Abdulhak met again with Minister al-Bahr and with Yominco's geological staff. Arabian Shield/Dorchester and the Yemeni officials reached broad agreement on terms of an exploration and production contract. The details remained to be worked out, and neither party had final authority to bind its side. Dorchester Gas Company's board of directors made changes to the proposal. The Arabian Shield/Dorchester group submitted its amended proposal on March 30, 1981. The following day, on March 31, Hunt Oil sent its proposed agreement. Hunt Oil learned of the Dorchester group's activities no later than March 19, 1981. Arabian Shield/Dorchester learned of Hunt Oil's presence sometime in June 1981.

Arabian Shield/Dorchester heard nothing from the Yemeni government for approximately three months. On June 25, 1981, Chase sent a telex asking about the status of the proposal to Minister al-Bahr. The minister replied that he had forwarded the proposal to a special committee for review. Al–Bahr sent Chase another telex on July 7, 1981, to tell him that the committee had not finished its review. On July 28, 1981, Abdulhak informed Chase of the contents of the Hunt Oil proposal. Chase discussed the Hunt Oil offer with Crichton. They decided to ask Hunt Oil to let them buy into the concession as twenty percent partners. Chase made the request on July 29. Hunt Oil told Chase that it had a firm deal with the Yemeni government and that it did not want a partner. The Council of Ministers approved the agreement with Hunt Oil on August 25, 1981. The Y.A.R. Constituent Assembly ratified the deal on January 16, 1982. On September 21, 1981, Crichton sent Ray Hunt a letter of congratulation. The letter made no mention of improper conduct by Hunt or Hunt Oil.

## THE LAWSUIT

On July 4, 1984, Hunt Oil announced a major discovery in the Safir Basin. The news jogged Arabian Shield's memory about the events of 1981. El–Khalidi, the President of Arabian Shield, wrote to Ray Hunt on July 10, 1984. The letter recited that one year earlier El–Khalidi heard a rumor that Arabian Shield's trusted agent, Shaher Abdulhak, approached Hunt Oil in 1981 bearing Arabian Shield's proprietary geological data. El–Khalidi also wrote that just a few days earlier a reliable source repeated to him the same rumor. He as-

serted that, if the allegations were true, Arabian Shield was "entitled to an equitable part in [the Safir] concession." He asked for a response and received none.

El–Khalidi wrote to Hunt again on October 22, 1984. He stated that he wished to resolve the matter of the reliable information he had received that Arabian Shield's agent, Abdulhak, helped Hunt Oil secure the Safir concession. He indicated some doubt that the rumors were true: "However, if in fact Mr. Abdulhak is not your agent or acted on your behalf to help secure the concession for you, please let us know, and we will drop the matter forthwith." The Hunt Oil organization responded. On November 1, 1984, George Cunyus, Ray Hunt's lawyer, wrote to El–Khalidi: "I am pleased, but not surprised, to advise you that the investigation has revealed that there is no support whatever for the suspicions in question. Mr. Abdulhak never worked for us." Hunt wrote directly to Crichton on November 2, 1984. Hunt enclosed a copy of Cunyus's letter to El–Khalidi and affirmed its truth. Crichton replied on November 7, 1984. He thanked Hunt (whom he had long known) for investigating El–Khalidi's suspicions. Crichton wrote that he had assured El–Khalidi that he deemed Hunt trustworthy. Hunt again wrote to Crichton. He declared that the results of the investigation were as he thought. He said he expected no more letters from El–Khalidi.

El–Khalidi was not satisfied. He penned another letter on December 22, 1984. He explained that a friend from Yemen (El–Khalidi lives in Jeddah, Saudi Arabia) had recently returned to Sana'a to find a job with Hunt Oil. The friend received advice to contact Abdulhak, whom someone told him was Hunt Oil's representative. According to El–Khalidi, his Yemeni friend said that Abdulhak's affiliation with Hunt Oil had become common knowledge in Sana'a. El–Khalidi continued: "A very high personage in Yemen visited me very recently here and informed me that Mr. Shaker Abdulhak is the new hero of the day in Yemen as he has become known as the man who brought the company (Hunt Oil) which found oil in the Yemen after the

majors had failed." El–Khalidi requested further comments from Cunyus.

El–Khalidi received no comment from Cunyus. He wrote again to Cunyus on January 19, 1985. El–Khalidi offered a chronology of events that he believed suggested wrong-doing by Hunt Oil, Abdulhak, and government officials in the Y.A.R. According to El–Khalidi, Arabian Shield/Dorchester had been willing on August 11, 1981 to sweeten the proposed deal with the Yemeni government. Dale Chase telexed the message to al-Bahr and to Abdulhak. Al–Bahr telexed back that the draft agreement was still under consideration. Abdulhak did not respond. On September 1, 1981, Abdulhak sent Chase a telex regretting that the Council of Ministers awarded the concession to Hunt Oil on August 23. In the January 19, 1985 letter, El–Khalidi's tone grew more hostile and threatening than it had been in his earlier letters:

> We thus plan to pursue the matter now with the highest levels in Yemen who may not be aware of all this, and we plan to ask that an investigation be started and compensation be awarded us because we shall petition that we lost the concession only due to possible chicanery of the officials concerned, while we were being led to continue to negotiate in good faith.... I shall be happy if you wish, to discuss this matter, with you and Mr. Hunt if he wishes, sooner and at greater length, before we start any action in Yemen to the above effect.

Cunyus wrote back on March 4, 1985. The letter repeated his assertion that Hunt Oil did nothing wrong: "All our dealings with government officials in the Yemen Arab Republic have been straight forward and above board." He threatened to sue El–Khalidi and Arabian Shield (presumably for defamation) if El–Khalidi continued to suggest improper conduct by Hunt Oil. Ray Hunt wrote to Crichton on March 14, 1985. The letter expressed appreciation to Crichton for his disavowal of El–Khalidi's accusations. Crichton wrote Hunt a friendly missive on April 1, 1985, which did not mention El–Khalidi's claims.

On April 20, 1985, El–Khalidi wrote Cunyus again. His language demonstrated a certainty of Hunt Oil's wrongdoing that was lacking in his previous letters:

In my letters to you which were frank and open because of Mr. Crichton's friendship with Mr. Hunt, *I presented irrefutable evidence* how we lost the concession through the chicanery of our agent and others.... *We are now aware of the role that a Mr. Moujib Al–Malazi, an 'exploration consultant' in London played in this deal,* and of his intimate association with Mr. Abdulhak. Perhaps at the time of initial relationship with Mr. Al–Malazi, you were not aware of his relationship with Mr. Abdulhak, but surely it must have become evident later on. We understand that Mr. Abdulhak was so anxious to dissasociate [sic] himself officially from your company that he had Mr. Hunt declare to the U.S. Ambassador in Yemen, that he was not your agent, although the Ambassador knew otherwise....

We shall alert our Saudi stockholders of the above facts so that they may take any action they deem necessary with their friends in Yemen, towards getting back what had been taken away from them by Chicanary [sic], and backroom dealings through 'consultants,' and double crossing agents, while their company was negotiating in good faith. We and them [sic] shall ask for a full investigation of the matter.

(Emphasis added). There is no record in the transcript that Cunyus or Ray Hunt responded to the April 20, 1985 letter.

El–Khalidi tried persuasion through correspondence once again on December 5, 1985. He wrote to Cunyus:

Having continued with our investigation since I wrote you last on April 20, 1985, the following facts have become evident, and we now know fully how Hunt Oil entered into Yemen through our agent there at the time, Mr. Shaher Abdul Hak [sic]:

Mr. Abdul Hak [sic] took my reports and sketches to Mr. Moujib Al–Malazi who then rewrote them attributing them to his own research. The deal was then taken to a very prominent Saudi who is very well connected in Yemen, whose name we know ... and he presented Hunt Oil with it and proposed to act, together with Mr. Abdul Hak [sic] on their behalf, to obtain the concession for them in Yemen. Officially, Mr. Abdul Hak [sic] did not appear in the picture, as he was the official representative of Dorchester Gas and Arabian Shield. Thus we were eliminated after having concluded a firm agreement with YOMINCO, as you know.

El–Khalidi again offered a settlement of the dispute as an alternative to threatened harsher action:

Again we state that we are willing to come to some equitable settlement with Hunt Oil, rather than engage in referring the matter to the highest levels in Yemen and Saudi Arabia.... Of course in any settlement, we don't expect Hunt Oil to confess to any perfidious behavior. Rather it will be a matter of one company doing voluntary business with the other for their mutual benefit.

Hunt Oil offered no settlement, and Arabian Shield took preliminary steps towards filing a lawsuit. In January 1986, Crichton and El–Khalidi conferenced several times with Hubert D. Johnson, Sr., an attorney. Johnson concluded that Arabian Shield might have a cause of action against Hunt Oil for tortious interference with an advantageous business relationship. He expressed some doubt about whether enough evidence could be uncovered to prove a case. He recommended "intensive pre-trial investigation and aggressive discovery after filing." Johnson noted that the statute of limitations might bar the claim, since the facts of the case arose in 1981. He could not state with certainty whether the two-year statute (TEX.CIV.PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986)) or the four-year statute (TEX.CIV.PRAC. & REM.CODE ANN. § 16.051 (Vernon 1986)) would apply. He judged that the four-year statute was more likely. Johnson also opined that the "discovery rule" would probably apply and help to overcome the limitations bar. Arabian Shield hired private investigators in

the spring of 1986 to find evidence. What the investigators uncovered is not apparent from the record.

Arabian Shield and Dorchester International filed this lawsuit on October 2, 1987. They alleged two causes of action: (1) tortious interference with contractual relations; and (2) breach of fiduciary duty, resulting in the creation of a constructive trust. To overcome the statute of limitations, they pleaded that Hunt Oil and the other defendants ·fraudulently concealed the facts giving rise to the causes of action. Hunt Oil, Ray Hunt, and the other defendants answered that they did not tortiously interfere with a contract and that the statute of limitations had run. After extensive discovery, Hunt Oil and the other defendants moved for summary judgment. They asserted several grounds: (1) that Arabian Shield/Dorchester failed to raise a genuine issue of material fact on tortious interference; (2) that Arabian Shield/Dorchester failed to show fraudulent concealment sufficient to toll the statute of limitations; and (3) that the Act of State doctrine shields the Hunt group from liability because they dealt with a sovereign nation. The trial court granted Hunt Oil and the other defendants summary judgment without specifying the grounds. By agreed order, Dorchester Master Limited Partnership (successor to Dorchester International, Inc.) has been dismissed from this action. Arabian Shield appeals from the summary judgment on its claim for tortious interference. Arabian Shield does not appeal from the judgment on its constructive trust claim. Because the trial court did not specify the basis for the ruling, Arabian Shield can prevail on appeal only by defeating every argument alleged in the summary judgment motion that might sustain the judgment. *McCrea v. Cubilla Condominium Corp.*, 685 S.W.2d 755, 757 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

## LEGAL ANALYSIS

On appeal, Arabian Shield concedes that the two-year statute of limitations applies to claims for tortious interference with a contract or with an advantageous business relationship. The tortious interference, if any, occurred in 1981. Arabian Shield filed its lawsuit on October 2, 1987. To overcome the limitations bar, Arabian Shield must show that the statute of limitations did not begin to run until after October 2, 1985. The statute begins to run when the cause of action accrues. TEX.CIV.PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986). We must determine at what point Arabian Shield's cause of action accrued.

■ Normally, the cause of action accrues when the plaintiff suffers injury. For an intersection collision, the cause of action generally accrues when the cars collide. Problems arise when a time lag exists between the wrongful conduct and the harm it causes or between the occurrence of harm and the point when through reasonable diligence the harm can be discovered. *See generally Robinson v. Weaver*, 550 S.W.2d 18, 19 (Tex.1977); *Zidell v. Bird*, 692 S.W.2d 550 (Tex.App.—Austin 1985, no writ). Courts have developed the "discovery rule" for handling situations where the plaintiff is unable to know of his injury at the time it occurs. *Robinson*, 550 S.W.2d at 19. When the discovery rule applies, the period of limitations commences when the plaintiff discovers or reasonably should have discovered the injury. *Hays v. Hall*, 488 S.W.2d 412, 413–14 (Tex. 1973).

## DISCOVERY RULE

■ In the context of the discovery rule, the injury is complete when the harm is done, and the victim knows (or should know) the cause in fact of the harm. *Timberlake v. A.H. Robins Co.*, 727 F.2d 1363, 1365–66 (5th Cir.1984). The accrual of the cause of action does not await the plaintiff's recognition that he has grounds for a lawsuit. In *Timberlake*, a Texas plaintiff wore a Dalkon Shield IUD. She developed severe pelvic inflammatory disease in March 1978. The following month she underwent a hysterectomy. Her doctor informed her that the IUD had caused her illness. In April 1981, Timberlake saw a television program that focused on the

584

problems caused by the Dalkon Shield. She then realized that A.H. Robbins may have acted wrongfully in the manufacture and sale of the IUD. Soon after, she filed her lawsuit, which alleged various theories of liability. Construing the same (two-year) statute of limitations, which Arabian Shield concedes applies to our case, the Fifth Circuit ruled that Timberlake's cause of action accrued in April 1978. At that point she learned that she had been injured and that the IUD had caused her injury. Accrual did not await her discovery three years later that A.H. Robbins may have behaved tortiously in the manufacture and distribution of the IUD.

## FRAUDULENT CONCEALMENT

Arabian Shield pleaded fraudulent concealment. It did not explicitly plead the discovery rule, though Hubert Johnson's report discusses it. Because Arabian Shield elected not to plead the discovery rule explicitly, strictly speaking, we need not address it. TEX.R.APP.P. 52(a) and 74(*l*). However, in the context of this case, a pleading of fraudulent concealment was probably intended also as an implicit pleading of the discovery rule. Under the facts of the case, the alleged tortious interference occurred in 1981. The alleged deception occurred in an exchange of correspondence in 1984 and 1985. Without application of some species of the discovery rule, the limitations period would expire in 1983, before the deception, if any, began.

Arabian Shield undoubtedly intended that a finding of fraudulent concealment, and thereby a tolling of the statute of limitations in 1984 and 1985, also serve as an application of the discovery rule for the period before the alleged deception occurred. Texas has long recognized a misnomer rule. A pleading which gives adequate notice will not fail merely because the draftsman named it improperly. TEX.R. CIV.P. 71. A pleading's substance is determined by the effect the pleading would have if granted by the trial court. *Austin Neighborhoods Council, Inc. v. Board of Adjustment*, 644 S.W.2d 560, 565 (Tex.App. —Austin 1982, writ ref'd n.r.e.). Arabian

Shield's pleading, if granted, would prevent the expiration of the limitations period before October 2, 1987. We will give Arabian Shield the benefit of the doubt on its pleadings. We will analyze the case under both the discovery rule and fraudulent concealment.

Arabian Shield alleged that Hunt Oil and the other defendants fraudulently concealed the 1981 tortious interference by lying about it in 1984 and 1985. Fraudulent concealment is the name given to the equitable doctrine that a defendant who conceals his wrongful conduct, either by failing to disclose it when under a duty to disclose or by lying about his conduct, is estopped to assert the statute of limitations. The essence of fraudulent concealment is first, actual knowledge that a wrong has occurred, and second, a fixed purpose to conceal the facts necessary for the plaintiff to know that he has a cause of action that has accrued. *Owen v. King*, 130 Tex. 614, 619, 111 S.W.2d 695, 697 (1938); *Leonard v. Eskew*, 731 S.W.2d 124, 128 (Tex.App.—Austin 1987, writ ref'd n.r. e.); *Dotson v. Alamo Funeral Home*, 577 S.W.2d 308, 311 (Tex.Civ.App.—San Antonio 1979, no writ). Fraudulent concealment is an affirmative defense to the statute of limitations under which the plaintiff has the burden of putting forth proof to support the allegation. *Weaver v. Witt*, 561 S.W.2d 792 (Tex.1977). In summary, the plaintiff must show: (1) existence of the underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception.

The estoppel effect is not permanent. Fraudulent concealment merely tolls or suspends the statute of limitations until the time the plaintiff learns of the facts that give rise to his cause of action or should learn of the facts in the exercise of reasonable diligence. *Leonard*, 731 S.W.2d at 128–29. As with any form of equitable estoppel, a plaintiff asserting fraudulent concealment must have relied reasonably on the defendant's lies or improper silence. Once the plaintiff knows or should know of

the deceit, reliance is no longer reasonable, and the tolling effect ends. Once on notice of the deception, the plaintiff must act diligently. "The statutory period does not await a plaintiff's leisurely discovery of the full details of the alleged scheme." *Humphrey v. J.B. Land Co.*, 478 F.Supp. 770, 772 (S.D.Tex.1979).

Though separate doctrines, the discovery rule and fraudulent concealment concern approximately the same situation, a circumstance in which the tortious conduct, or its harm, is inherently difficult to discover or is made difficult to discover by the defendant's deception. (See discussion above.) However, the doctrines serve different purposes. *Weaver v. Witt*, 561 S.W.2d 792, 793–94 (Tex.1977). The discovery rule determines when a cause of action accrues. *Weaver*, 561 S.W.2d at 794. Fraudulent concealment concerns whether, and for how long, the statute of limitations is tolled.

For purposes of this summary judgment, there is no effective difference between the allegation of fraudulent concealment on the part of Hunt Oil and Ray Hunt and the application of the discovery rule. For either analysis, the correspondence between El–Khalidi, Cunyus, Ray Hunt, and Crichton represents the primary evidence before the trial court of what Arabian Shield learned about its cause of action and when it learned it.

■ Under discovery rule analysis, Arabian Shield's cause of action accrued, and the two-year statute of limitations began to run, when Arabian Shield learned that it had suffered injury and discovered the cause in fact of the injury. *Timberlake*, 727 F.2d at 1365–66. Accrual did not await Arabian Shield's recognition that it might have a winning lawsuit. *Id.* Arabian Shield suffered its injury in August 1981, when the government of the Y.A.R. chose to award the Safir Basin concession to Hunt Oil rather than to Arabian Shield/Dorchester. Arabian Shield undoubtedly recognized its injury by September 21, 1981, when Crichton sent Ray Hunt a letter congratulating him for winning the Safir concession.

Assuming without deciding that Hunt Oil tortiously interfered with Arabian Shield/Dorchester's negotiations with the Yemeni government, we now analyze the correspondence between the parties to determine when Arabian Shield learned that some sort of tortious interference had occurred. For purposes of discovery rule analysis, we need consider only what Arabian Shield knew (as reflected in El–Khalidi's letters), not what the Hunt group said. *See Hays v. Hall*, 488 S.W.2d 412 (Tex. 1973). El–Khalidi's July 10, 1984, letter to Ray Hunt mentioned · that El–Khalidi had heard rumors of wrongful conduct by Hunt Oil (using confidential information, belonging to Arabian Shield, supplied by Shaher Abdulhak) and that he considered the rumors reliable. However, El–Khalidi's letter of October 22, 1984, indicates that he was not yet persuaded that the rumors were true. He wrote: "However, if in fact Mr. Abdulhak is not your agent or acted on your behalf to help secure the concession for you, please let us know and we will drop this matter forthwith."

As time went on, El–Khalidi's conviction and knowledge grew. His December 22, 1984, letter to Cunyus recites that several sources informed him that Abdulhak betrayed Arabian Shield in favor of Hunt Oil and still represented Hunt Oil. El–Khalidi stated that "the evidence [he] presented to [Cunyus] is not petty hearsay, nor is it based on mere rumors." Nonetheless, El–Khalidi asked for Cunyus's comments. His letter did not demonstrate the hostility of a man certain that he had been wronged. El–Khalidi's January 19, 1985 letter adopted a hostile and threatening tone:

> We thus plan to pursue that matter now with the highest levels in Yemen ... and we plan to ask that an investigation be started and compensation awarded to us because we shall petition that we lost the concession only due to the possible chicanery of the officials concerned.

The language of the January 19, 1985 letter may show enough certainty of wrongdoing by Hunt Oil for us to declare as a matter of law that Arabian Shield knew generally the cause in fact of its injury. If

the January 19, 1985 letter is insufficient for that purpose, El–Khalidi's April 20, 1985 letter to Cunyus is sufficient. He wrote:

> In my letters to you which were frank and open because of Mr. Crichton's friendship with Mr. Hunt, I presented irrefutable evidence how we lost the concession through the chicanery of our agent and others. . . . We are now aware of the role that a Mr. Moujib al-Malazi, an "exploration consultant" in London played in this deal, and of his intimate association with Mr. Abdulhak. . . . We understand that Mr. Abdulhak was so anxious to dissasociate [sic] himself officially from your company that he had Mr. Hunt declare to the U.S. Ambassador in Yemen, that he was not your agent, although the Ambassador knew otherwise.

Two paragraphs later, El–Khalidi threatened "a petition to the highest authorities in Yemen to seek judgment, compensation and restitution, now that we have all evidence in hand." El–Khalidi's declaration that by April 20, 1985, he was aware of the role that Minister al-Bahr, al-Malazi, and Abdulhak played in wrongfully diverting the concession to Hunt Oil, and El–Khalidi's recitation that he had all the evidence in hand is enough to show that by April 20, 1985, Arabian Shield knew the cause in fact of its injury. We conclude that Arabian Shield's cause of action accrued no later than April 20, 1985. The two-year statute began to run. *Timberlake*, 727 F.2d at 1365–66.

■ We reach the same result when we analyze Arabian Shield's fraudulent concealment allegation. Because Hunt Oil had no confidential relationship with Arabian Shield, it owed no duty to disclose its tortious conduct, if any. *Owen*, 111 S.W.2d at 697. However, there is no privilege to lie to a victim in order to conceal a cause of action. *Leonard*, 731 S.W.2d at 128. Assuming without deciding that Arabian Shield's summary judgment evidence raises a genuine issue of material fact on the underlying cause of action (tortious interference), we must decide when Arabian Shield knew enough that a reasonable person in its place would disbelieve Hunt Oil's denials of improper conduct. *Timberlake*, 727 F.2d at 1367. At that point, reliance became unreasonable and the tolling effect ended.

The Hunt Oil organization ignored El–Khalidi's July 10, 1984 letter. It responded to the October 22, 1984 letter. On November 1, 1984, Cunyus wrote to El–Khalidi: "I am pleased but not surprised, to advise you that the investigation has revealed that there is no support for the suspicions in question. Mr. Abdulhak never worked for us." Ray Hunt wrote to Crichton on November 2, 1984. He enclosed a copy of Cunyus's letter to El–Khalidi and affirmed its truth. Crichton wrote back to Hunt on November 7, 1984, thanking him for investigating El–Khalidi's apprehensions. Hunt followed up his earlier letter on November 14, 1984. He assured Crichton that the results of his investigation were as he thought. He said he expected no more letters from El–Khalidi. After El–Khalidi's nasty letter of January 19, 1985, Cunyus responded: "All our dealings with government officials in the Yemen Arab Republic have been straightforward and above board." Cunyus threatened to sue El–Khalidi and Arabian Shield (presumably for defamation) if he continued to suggest otherwise.

El–Khalidi's April 20, 1985 letter indicates disbelief of Hunt Oil's assurances. After listing his specific accusations (see above), El–Khalidi threatened: "We shall alert our Saudi shareholders of the above facts so that they may take any action they deem necessary with their friends in Yemen, towards getting back what had been taken away from them by chicanary [sic], and backroom dealings through 'consultants', and double crossing agents, while their company was negotiating in good faith. . . ." El–Khalidi's last sentence demonstrates his conviction: "We are right, sir, and no amount of legal saber rattling on your part will deter us from what we must do unless we can come to an equitable agreement soonest [sic]."

We conclude that, as a matter of law, El–Khalidi, the President of Arabian

Shield, knew enough of the facts by April 20, 1985, for the estoppel effect to end. "The statutory period does not await a plaintiff's leisurely discovery of the full details of the alleged scheme." *Humphrey,* 478 F.Supp. at 772. On April 20, 1985, El–Khalidi no longer believed the Hunt organization's assurances. He specifically accused Hunt Oil of participating in an improper scheme to divert the Safir Basin concession away from Arabian Shield/Dorchester after he believed his company had made a deal. El–Khalidi identified the players in the improper scheme, Hunt Oil, Ray Hunt, al-Malazi, Abdulhak, and Minister al-Bahr. El–Khalidi did not know the full details of the tortious interference. Arabian Shield learned more about its possible cause of action once it filed suit and took al-Malazi's deposition. That is the purpose of pre-trial discovery. Nonetheless, by April 20, 1985, Hunt Oil's deception (if any) had broken down. Arabian Shield no longer relied on it, and the statute of limitations was no longer tolled. From a point no later than April 20, 1985, Arabian had two years to file suit. TEX. CIV.PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986). The limitations period ran no later than April 20, 1987. Arabian Shield and Dorchester filed suit on October 2, 1987.

 Arabian Shield claims that it acted diligently. It argues that due to difficulties it experienced in uncovering enough admissible evidence, it could not file a lawsuit in good faith much sooner than it did. *See* TEX.R.CIV.P. 13. Arabian Shield contends that therefore the statute of limitations should have tolled longer. Arabian Shield points out that in January 1986, El–Khalidi and Crichton consulted counsel, Hubert Johnson, Sr. He told them in an April 3, 1986, report that "many absolutely essential facts [were] not known at [that] time." He said that a "reasonable prospect" existed that "intensive investigation before suit and aggressive discovery after suit is filed" might develop the evidence necessary to create jury issues. Arabian Shield relies on Johnson's opinion to argue that it acted reasonably in waiting until October 1987 to file this action.

We disagree. Johnson recommended intensive investigation before suit, but his opinion recognized that the suit had a statute of limitations problem. He also recommended aggressive discovery after initiation of suit. He did not tell Arabian Shield to wait seventeen months after receiving his opinion before filing suit. Arabian Shield waited an additional nine months after El–Khalidi's April 20, 1985 letter before consulting Johnson. The fact that in Johnson's opinion Arabian Shield did not have sufficient admissible evidence in January 1986 (when the company consulted Johnson) does not excuse the long delay before contacting Johnson or the longer delay after contacting Johnson before filing suit. In addition, Johnson's evaluation relied upon the application of a four-year statute of limitations for tortious interference instead of the two-year statute. The question was unsettled in Texas at the time Johnson wrote his opinion in April 1986. The Texas Supreme Court settled the question in November 1986. The two-year statute applies, as all parties now concede. *See First Nat'l Bk. of Eagle Pass v. Levine,* 721 S.W.2d 287, 289 (Tex. 1986).

The statute of limitations bars this action. We affirm the summary judgment on that ground. We need not address Arabian Shield's other points of error. It is so ordered.