Linda J. FARIAS, Appellant,

v.

LAREDO NATIONAL BANK, Appellee.

No. 04–96–00475–CV.

Court of Appeals of Texas,
San Antonio.

July 31, 1997.

Rehearing Overruled Sept. 30, 1997.

Review Denied Aug. 25, 1998.

Rehearing Overruled by Supreme Court Oct. 15, 1998.

Michael C. McCrea, Law Offices of Michael C. McCrea, Johnson City, Thomas H. Crofts, Jr., Wallace B. Jefferson, Crofts, Callaway & Jefferson, P.C., San Antonio, for Appellant.

Michael P. Graham, John W. Porter, Macey Reasoner Stokes, Baker & Botts, L.L.P., Houston, Charles R. Borchers, Martha Cigarroa De Llano, Person, Whitworth, Ramos, Borchers & Morales, Laredo, for Appellee.

Before HARDBERGER, C.J., and STONE and GREEN, JJ.

## OPINION

HARDBERGER, Chief Justice.

### INTRODUCTION

This is a statute of limitations case. The Laredo National Bank, acting as trustee, sold a farm in Laredo, Texas in November 1968. It sold the seventy acres involved for $1,610 per acre, for a total sales price of $113,795.25. Subsequent events proved this was too cheap. The buyer, B.P. Newman, divided the land into smaller parcels and, within twenty-eight months, had sold the parcels for $4,500 an acre, making about a 300% profit. Twenty-two years later, in December 1990, the bank was sued. The question is whether that was too late.

### FACTUAL BACKGROUND

Mattie C. Johnson created an *inter vivos* trust in 1957. She conveyed all of her property in trust to the Laredo National Bank (LNB) and Lucile Johnson Weymer, her daughter, as co-trustees. She named herself as lifetime beneficiary. Upon her death, the trust provided for distribution of the assets into three separate trusts for the benefit of her three children. Their names were Lucile Johnson Weymer, Joe Johnson, and Ross Johnson. LNB was directed to pay the income from each trust to the respective beneficiary, along with so much of the corpus as was necessary for the support of the beneficiary. Upon the death of any beneficiary, the residue of that beneficiary's trust was to be equally divided among the trusts of the remaining beneficiaries. The three chil-

dren's trusts were to terminate upon the death of the last surviving beneficiary, and any remaining assets were to be distributed to any descendants of Mrs. Johnson's three children.

In due time, Mrs. Johnson died. All of her children were still living and were entitled to the fruits of the trust. The trust, however, was not large and income was modest. The two boys, now men in their sixties, were hard up. Both were retired, and both had health problems. Joe was living on social security, and was stone deaf. It was not clear what Ross lived on, as he had a very spotted work record and now was also suffering from cancer. Times were hard enough for Joe and Ross that they had to send their medical bills, and sometimes even the grocery bills, directly to the bank to be paid. Lucile, an educated, retired schoolteacher of seventy-two, was holding her own. Neither Lucile nor Ross had children, but Joe did. One of these children, Linda Johnson Farias, is the plaintiff in this lawsuit. Her siblings assigned their interest to her.

One of the primary assets of the trust was an undeveloped tract of land in Laredo known then as the Johnson Farm. It originally had eighty acres, but by the time of the 1968 sale, ten acres had been sold off to fund the demands on the trust. The farm was undeveloped, not producing any income, and was costing the trust money in property taxes. But it did have one great asset: a railroad track running right through it. This made it an ideal location for warehouses. Although warehouses were not in demand at the time, the property was well-suited when the need came.

In 1967, a potential buyer named James Cazamias approached LNB and said he was willing to buy the entire farm for $1,600 an acre. The bank and Lucile consulted and hired an appraiser, who came back with a figure of $3,500 an acre for eighteen acres on the railroad track, but a disappointing $100 an acre for the rest. Lucile and LNB made a counter-offer to Cazamias of $1,650 an acre for the entire tract and a ninety-day option to purchase. The option was never exercised, however, and the sale fell through.

There were no further developments on the sale of the land until November 1968. However, a warehouse was then being built on one of the small parcels that had been sold earlier. This new construction would have a favorable influence on the value of the remaining land, making it worth more than it was appraised at a year before. In November 1968, LNB arranged to sell the last seventy acres to a newly-formed corporation called B.P. Newman Investment Company. This company was wholly owned by a Laredo businessman named B.P. Newman. Newman paid $1,650 an acre for the remaining seventy acres. LNB recommended the sale, and the beneficiaries agreed. Newman made a good buy, and turned a tidy profit. Over the next twenty-eight months, he resold the seventy acres in eight transactions for prices that averaged $4,500 an acre, about three times what he paid for it.

There is no evidence that any of the three beneficiaries, or the plaintiff for that matter (although her interests were not to vest for many years), were dissatisfied at the time. The trust was funded, the beneficiaries' lives were eased, and the current of time flowed past. A generation passed away. Ross died in 1983, Joe in 1987, and Lucile in 1988.

In October 1986, eighteen years after the sale of the property and one year before her father died, Linda Farias was told something disturbing. She and her husband talked to Ed Dryden, a friend of Farias's husband, who told them that the Newman sale was not properly done and suggested that there was "something fishy" about the whole transaction. Dryden, who was in the title business, was in a position to know. Farias contacted LNB and requested a copy of the trust agreement, a list of the assets at the inception of her grandmother's trust, and a list of current assets. Within a month, LNB provided her with these documents. For the next four years and two months, Farias pursued the matter, sometimes in a desultory fashion and other times with vigor. LNB was sometimes quickly cooperative, and other times obstructive. In December 1990, Farias filed suit against LNB, claiming, in effect, that the sale was an insider's deal that resulted in the land being sold to a friend of

the bank at a greatly inadequate price, causing the trust to be cheated out of most of its money. In November 1995, a Laredo jury agreed wholeheartedly with Farias, and awarded $2,264,000 in damages. The trial court, however, entered a judgment notwithstanding the verdict on statute-of-limitation grounds, resulting in a take-nothing judgment. This appeal ensued.

Farias brings forth nine points of error in her appeal to this court. In her first seven points of error, Farias claims that the trial court erred in rendering judgment notwithstanding the verdict because: (1) LNB failed to properly challenge the jury's fraudulent concealment finding; (2 & 3) Farias's claims are not barred even if the claims of her predecessors in interest are barred; (4 & 5) the discovery rule is applicable in this case; (6) Farias had no notice of her claims more than four years before suit was filed because LNB fraudulently concealed material information; and (7) LNB was estopped from asserting the limitations defense in this suit. In her eighth point of error, Farias contends that the claims her siblings assigned to her are not barred by limitations. In her ninth point of error, Farias argues that the trial court should have rendered judgment awarding damages over and above those found by the jury.

## DISCUSSION

Farias's claim is larger than LNB not getting enough for the property. She asserted, and the jury obviously agreed, that LNB was more interested in taking care of Newman than it was in fulfilling its duties to the trust. Farias points out the following deficiencies in LNB's conduct:

(1) LNB failed to advertise the land in the newspaper, or anywhere else for that matter.

(2) LNB never put a "For Sale" sign on the property.

(3) LNB failed to get a fresh appraisal after the new warehouse was built on the adjoining property.

(4) LNB never hired a real estate broker or developer to help sell or develop the property.

(5) LNB sold the land to Newman, who was a friend of Max Mandell, the president of LNB.

(6) Newman owned five shares of stock in the bank (out of 10,000 shares).

(7) LNB did not require Newman to produce a financial statement, or to personally guarantee his company's indebtedness.

(8) LNB did not require Newman to come up with a development plan for the property.

■ We assume without deciding in this appeal that all of the above things were done improperly by LNB, and we further assume that as a result of these shortcomings, the Johnson Farm was sold for too little, damaging the trust. Most of these acts, though, were either known or knowable at the time of the sale in 1968. The beneficiaries knew the price for which the land was sold and to whom it was sold. Living in Laredo, Joe, Ross, and Farias would have known it was not being advertised in the newspaper and that there was no "For Sale" sign on the property. They would have known, or could easily have discovered, that no real estate broker was working with the property and that no new appraisal had been made since the last effort to sell the land. They would have known a new warehouse had been built on a parcel of land that was formerly a part of the Johnson farm. They may or may not have known that Newman and Mandel were friends, and they would not have known, and had no easy way to find out, that Newman owned five shares in the bank (the bank itself denied it knew until discovery in this case). They would not have known that the bank should have required a personal financial statement, personal guarantee, and development plan from Newman. None of these last shortcomings, though, produced any damages. Newman's company did not default. Indeed, Newman's company made all payments on time and the trust received that for which it had contracted.

We recognize that these last shortcomings are evidence that the sale was an "insider's deal," and we accept for purposes of this

appeal that LNB was shortcutting its usual procedures either because it was an "insider's deal" or because it was trying to meet the needs of the beneficiaries. In our opinion, however, the three beneficiaries, in knowing the price for which the land sold, to whom it was sold, when it was sold (Lucile, as trustee, signed the deed), and that there were no visible efforts made to market it, knew enough to start the statute of limitations running. True, they did not know every detail. But they knew enough to make reasonable inquiries if they were dissatisfied. In sum, assuming without deciding that the longer four-year statute of limitations applies to the claims of the original beneficiaries, we conclude that the statute ran in 1972 as to Lucile and her brothers.

We turn now to the more difficult question of whether the claims of Linda Farris and her siblings are barred by the statute of limitations as well.

### Claims of Linda Farias and Her Siblings

There is an element of Dicken's "Bleak House" in this case. When the land was sold, Linda was a young adult of twenty-five. Now she is a grandmother, fifty-four years old, and trained as a legal secretary. She was told of the suspicious circumstances of the sale of the land in October 1986. Her informant was a man named Ed Dryden, a man who in 1968 worked at a local title company in Laredo. Dryden told Farias and her husband that he saw things that had "caused him concern" regarding the sale of the property, and that there was "something fishy" about the sale. He told them that he knew Max Mandel and B.P. Newman were friends and that "it was well known in Laredo in the business community that they did business together." Farias acted almost immediately to follow up Dryden's comments. She went to LNB and talked to an officer there, Joaquin Romero, in 1986. She asked for and received some papers about the trust. She also hired a lawyer in late 1986 to represent her in connection with the subject matter of this suit. In January 1987, Farias and her lawyer met with the vice president of LNB to discuss her concerns. Farias's lawyer followed up the meeting with requests

for lists of trust assets and annual trust reports. LNB provided them in a reasonable time. She had earlier requested and received the trust agreement, a list of the assets at the inception of her grandmother's trust, and a list of current assets. The annual statement for the year ending June 10, 1969 disclosed the sale of the farm, the identity of the purchaser, and the purchase price.

From October 1986 until the suit was filed in December 1990, there were interchanges of information between Farias and the bank. There were gaps of time when Farias did nothing of record, and other times when she and her attorneys (there were three in all) were actively pursuing the gathering of information. LNB was sometimes quick to respond to Farias's requests, and at other times drug its feet citing exaggerated difficulties in finding the records. The last of the material, which contained the original appraisal, the trust minutes, and stockholder records, was not provided until May 1994, three and one-half years after the suit was filed.

### Procedural History

After suit was filed, LNB moved for summary judgment, alleging that Farias and her siblings were not beneficiaries entitled to an accounting under the Trust Code. The trial court granted the motion and Farias appealed to this court. We reversed and remanded, holding that Farias and her siblings were beneficiaries of the Mattie C. Johnson trust.

On remand, Farias moved for summary judgment, claiming that LNB failed to convey the Johnson Farm mineral interests to the remaindermen beneficiaries upon termination of the trust. LNB explained that the interests were inadvertently omitted from the final distribution due to a bookkeeping error, and executed warranty deeds to each of the five siblings. The trial court granted Farias's motion, conveying the mineral interests to her and awarding approximately $7,000 in attorney's fees. This ruling is not appealed, and is, therefore, not at issue.

In May 1994, Farias was finally provided access to LNB's trust files. Farias filed a second amended petition in October 1994, alleging that LNB had fraudulently con-

cealed information pertaining to her cause of action and was estopped from relying on a limitations defense. Farias also dropped all plaintiffs except herself in her second amended petition. Farias's siblings had assigned their claims to her, but Farias did not plead this assignment until about a year later. In July 1995, Farias filed a fourth amended petition, pleading the discovery rule. Finally, in November 1995, one week before trial, Farias filed a fifth amended petition alleging her siblings had assigned their claims to her.

## The Verdict

Trial was to a jury, which found in favor of Farias on her claims of fraud and breach of fiduciary duty in connection with the sale of the Johnson Farm. The jury awarded damages totaling over two million dollars, calculated as follows:

| | |
|---|---:|
| Actual damages (breach of fiduciary duty) | $ 382,000 |
| Punitive damages (breach of fiduciary duty) | 1,000,000 |
| Actual damages (fraud) | 382,000 |
| Punitive damages (fraud) | 500,000 |
| | $2,264,000 |

In response to limitations questions proposed by Farias and submitted over LNB's objection, the jury also found that the beneficiaries knew or reasonably should have known of their claims in May 1994, and that LNB was equitably estopped from asserting the limitations defense against Farias. LNB moved for a judgment notwithstanding the verdict on several grounds, including limitations. The trial court granted the motion "on the statute of limitations grounds," stating that the claims of Farias, individually and as assignee of her siblings' claims, were barred by limitations as a matter of law.

## Standard of Review

■ A court may enter a judgment notwithstanding the verdict only when a directed verdict would have been proper. TEX.R. CIV. P. 301; *Eubanks v. Winn,* 420 S.W.2d 698, 701 (Tex.1967). We must view the evidence favorable to the jury's verdict and disregard all contrary evidence and inferences. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *see Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983). "A jury's an-

swer to a special issue may be disregarded only when it has no support in the evidence or when the issue is immaterial." *C. & R. Transp., Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex.1966); *see also Eubanks v. Winn,* 420 S.W.2d at 701. The judgment notwithstanding the verdict should be reversed when there is more than a scintilla of competent evidence to support the jury's finding. *Rowe v. Rowe,* 887 S.W.2d 191, 195 (Tex. App.—Fort Worth 1994, writ denied).

## Statute of Limitations

■ Any current discussion of the law of statute of limitations must begin with the recent Supreme Court case of *S.V. v. R.V.,* 933 S.W.2d 1 (Tex.1996), a sexual abuse case in which repressed memory was alleged. *S.V.* is a classic statute of limitations case, and the issue is thoroughly explored. The court noted in *S.V.*:

> Limitations statutes afford plaintiffs what the legislature deems a reasonable time to present their claims and protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise.

*Id.* at 3 (quoting *Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 828 (Tex. 1990)). Statutes of limitations usually begin to run on the date the cause of action accrues. *See id.* at 4. "[A] cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *Id.* The alleged wrongful act in this case was the bank's failure to follow usual procedures and its sale of the property to a friend of the president for an inadequate sum. This happened in 1968, twenty-two years before the filing of the lawsuit.

■ From time to time, this rule has proven too harsh. The vast majority of statutes of limitation are either two years, *see* TEX. CIV. PRAC. & REM.CODE ANN. § 16.003 (Vernon Supp.1997), or four years, *see id.*

§ 16.051 (Vernon 1986). Consequently, an exception to a strict interpretation of the statute of limitations evolved—the "discovery rule." Some wrongs are unknowable until something happens to change the situation. The discovery rule doctrine holds that the action does not accrue until the plaintiff knew or in the exercise of reasonable diligence should have known of the wrongful act and resulting injury. *See Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 262 (Tex.1994). There is a deferred accrual in these cases. Cases involving fraud and fraudulent concealment also have deferred accrual. These are not true discovery rule cases, having different reasons for the deferred accrual. They have much in common though. Fraudulent concealment tolls or suspends the statute of limitations until the time the plaintiff learns of facts giving rise to her cause of action, or should learn of the facts in the exercise of reasonable diligence. *Sanchez v. Hastings*, 880 S.W.2d 471, 475 (Tex.App.—San Antonio 1994), *rev'd on other grounds*, 898 S.W.2d 287 (Tex.1995); *Arabian Shield Dev. Co. v. Hunt*, 808 S.W.2d 577, 584–85 (Tex.App.—Dallas 1991, writ denied). As our Texas Supreme Court has explained:

> The estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action. Knowledge of such facts is in law equivalent to the cause of action.

*Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex. 1983). We analyze the facts in this case under both the discovery rule and the doctrine of fraudulent concealment, thus rendering Farias's fourth and fifth points of error irrelevant.

■ The jury in the case at bar found that LNB breached its fiduciary duty and committed fraud. For purposes of this appeal, we assume that these are correct findings. The fraud finding included a finding of fraudulent concealment. Therefore, we are dealing with two wrongs. Breach of a fiduciary duty has a two-year statute of limitations. *See International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 579 (Tex.1963). Fraud has a four-year statute of limitations. TEX. CIV. PRAC. & REM.CODE ANN. § 16.051; *see also Williams v. Khalaf*, 802 S.W.2d 651, 658 (Tex.1990) (holding that "[t]he 1979 amendment now makes all fraud actions consistent, in that they have a four-year limitation period, regardless of the remedy sought"). As fraud has the longer statute of limitations, we will consider it to be the governing statute.

■ Fraudulent concealment has the effect of estoppel. It does not last indefinitely, however:

> Fraudulent concealment merely tolls or suspends the statute of limitations until the time the plaintiff learns of the facts that give rise to his cause of action or should learn of the facts in the exercise of reasonable diligence.... Once the plaintiff knows or should know of the deceit, reliance is no longer reasonable and the tolling effect ends. Once on notice of the deception, the plaintiff must act diligently. "The statutory period does not await a plaintiff's leisurely discovery of the full details of the alleged scheme." *Humphrey v. J.B. Land Co.*, 478 F.Supp. 770, 772 (S.D.Tex.1979).

*Arabian Shield Development Co.*, 808 S.W.2d at 584–85. Applying the above law to the case before us, we must first consider if the failure of the original beneficiaries, or Linda Farias herself, to take any action in the four years after the sale of the property in 1968 caused the statute to run. Farias was an adult at the time of the sale. On the other hand, she was only a contingent or potential beneficiary—a remainderman—at that time. The original beneficiaries knew, or had the ability to know, the following essential facts: (1) the land was not advertised in the local newspaper, (2) the land did not have a "For Sale" sign on it, (3) there had been no new appraisal since a man who purchased the smaller parcels previously had erected a warehouse on one of the parcels, (4) the identity of the buyer, (5) what Newman paid for the land, (6) when the land was sold, and

(7) the buyer of the land was selling individual pieces and making a profit.

Lucile was a co-trustee of the trust, along with LNB. She signed the deeds of sale on the earlier tracts of land that were sold, as well as the deed of sale on the subject property. She had occasional conversations and correspondence with LNB about the property. The testimony is clear that it was her desire to sell the property. When the earlier potential sale to Cazamias fell through, she expressed disappointment and she was happy to sell the land to Newman, as were her brothers. She was an educated and intelligent woman. She had a rational reason for wanting to sell the land: to take care of her brothers, who were up in years and practically destitute. We do not equate her knowledge of land and land prices with that of LNB. LNB had the responsibility of taking appropriate steps to make sure a fair market price was paid for the land. LNB knew, or had the responsibility to know, the fair market price of the land. To the degree that LNB failed in that duty, it was civilly liable.

Whatever the shortcomings of LNB were, most were obvious at or near the time of the sale, and certainly were within the four years following the sale. Within twenty-eight months, Newman had sold all of the tracts with a 300 % profit. Even if Lucile, Joe, and Ross were entirely ignorant of the proper value of the land, it does not take much sophistication to understand that if a parcel of land is sold and the buyer resells it within twenty-eight months for a 300% profit, a reasonable person would question the original sales price. Lucile and her brothers already knew, or should have known, that there had not been a "For Sale" sign on the property, and that it was never advertised in the newspaper. In short, the beneficiaries would have known between 1968 and 1972 of their injury, and some of the reasons for it. They may not have known, and probably did not know, all of the details, but the injury had accrued and was knowable.

■ A fiduciary's duty is inherently undiscoverable because the person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or unaware of the need to do so. *See Willis v.*

*Maverick,* 760 S.W.2d 642, 645 (Tex.1988). But this situation does not necessarily last forever. It changes with circumstances. As the supreme court recognized in *S.V.:*

> While a person to whom a fiduciary duty is owed is relieved of the responsibility of diligent inquiry into the fiduciary's conduct, so long as that relationship exists, when the fact of misconduct becomes apparent it can no longer be ignored, regardless of the nature of the relationship.

*S.V.,* 933 S.W.2d at 8.

Farias's position is that she did not know of her injury until May 1994 when she finally obtained the two boxes of the trust files in discovery. As Farias's attorney explained, Farias and the other remaindermen were understandably vexed at LNB's long delay in making the information available to her and "it was then [in 1994] that they discovered the undisclosed facts on which the findings of fiduciary breach and fraud are based." Logically, though, whatever was found in those boxes could not be the reason for the late filing of this lawsuit. If it were, the lawsuit would have been filed upon the discovery of these facts. The suit would have followed the discovery. In fact, the case had already been ongoing for three and one-half years when the boxes were first seen. What would have been learned is more details—details that favored Farias and injured the defense of LNB. This is the usual state of things. Discovery usually has the effect of helping one side and hurting the other. That is the reason discovery is done. If it was necessary to know every detail of a wrongdoing before the plaintiff filed a lawsuit, few lawsuits would get filed.

The issue is whether the trust files, first seen by Farias in 1994, revealed anything that was not already known, and whether such new information would have an impact on the statute of limitations. The only thing to which Farias testified at trial that was in the trust files and not previously known was the fact that the mineral interests under the Johnson farm had not been conveyed. The bank claimed this was an oversight, but, in any case, the mineral rights had been conveyed to the remaindermen by the time of trial and were neither at issue at the trial nor

during this appeal. There is no other direct testimony as to what Farias discovered in the trust files that she did not already know.

As previously stated, Farias was twenty-five years old when the property was sold, and she was twenty-nine years old when the four-year statute ran in 1972 as to Lucile and her brothers. Farias lived in Laredo, as did the two male beneficiaries—her father Joe, and her uncle Ross. Lucile lived in McAllen. All the essential facts were known, and no one complained. This court, in ruling in favor of Farias on a summary judgment, held in an earlier, unpublished opinion that Farias was a beneficiary:

> Whether we identify that interest as contingent, defeasible, or vested subject to divestiture is irrelevant. Appellants [Farias and the other remaindermen] are persons for whose benefit property was held in trust.... [W]e conclude that appellants are beneficiaries under the Mattie C. Johnson Trust.

*Farias v. Laredo National Bank,* No. 04–92–00163–CV, slip op. at 6 (Tex.App.—San Antonio 1992, no writ). This court has also held that a remainderman under a testamentary trust is an interested person actually interested within the meaning of section 115.011(a) of the trust code:

> Defendants assert that plaintiff, who has no interest in the net income from the trust and is merely a remainderman as to the corpus, lacks sufficient interest to enable her to maintain the present suit. We do not agree. If funds which should have been applied to the preservation of the property in which plaintiff had an interest were being diverted to other purposes, the injury to her interest is clear. She is clearly a person "actually interested" within the meaning of the provisions of the Texas Trust Act....

*Yturri v. Yturri,* 504 S.W.2d 809, 812 (Tex. Civ.App.—San Antonio 1973, no writ). In short, Farias, as well as the original beneficiaries, could have sued in the four years after the sale. It is the opinion of this court that the statute of limitations ran in this case as to both Farias and the trustee, Lucile, in 1972—four years after the sale. Farias's second and third points of error claiming that the statute of limitations did not begin to run as to the remaindermen until their interests vested are overruled.

 Even assuming, however, that the statute did not run in 1972 as to the remaindermen due to fraudulent concealment or estoppel, this changed in October of 1986. At this time, Farias was told by a knowledgeable person, Ed Dryden, who was in the title business, that things were amiss regarding the sale. He told her it caused him concern, and he further explained to her the close friendship of Max Mandel, the president of the bank at the time of the sale, and the buyer of the property, B.P. Newman. He told her not only were the two close friends, but "it was well known in Laredo in the business community that they did business together." Assuming without deciding that Farias knew nothing about the sale that would have put a reasonable person on notice until that time, she now had notice. She acted on this information almost immediately. She hired a lawyer at "about this time," and went to the bank to talk to the appropriate officers and to seek documents. For whatever reason, though, she did not file her lawsuit until December 1990, more than four years after being put on notice, obtaining legal counsel, and beginning her investigation.

In this lawsuit, as in the majority of lawsuits, not every detail of LNB's actions was known until the discovery ended. But all the essential facts were known in October 1986. Farias's voir dire and opening statement in 1995 were not materially different from what Dryden had told Farias in 1986: LNB, acting through Mandel, got together with his old friend and business associate, B.P. Newman, and intentionally sold him the land for an inadequate price. As a result, all the beneficiaries got less than they should have. A few details were etched in during discovery, but these did not change the accusation or the injury. The details were merely supportive in nature. As one court of appeals recognized:

> Under Texas law, it is the discovery of the injury, and not the discovery of all the elements of the cause of action that starts

the running of the clock for limitations purposes.... [A]ll that is required to commence the running of the limitations period is the discovery of an injury and its general cause, not the exact cause in fact and the specific parties responsible.

*Bayou Bend Towers v. Manhattan Const.,* 866 S.W.2d 740, 743 (Tex.App.—Houston [14th Dist.] 1993, writ denied). Farias's brothers and sisters assigned their claims to Farias. They would have the same rights as Farias, but would also be subject to the same defenses.

Our holding in this case is that all of the claims are barred by the statute of limitations and any jury findings to the contrary must be set aside as a matter of law. Farias asked for and received estoppel and fraudulent concealment findings from the jury, but these would only be operative until Farias had actual notice of injury. We find as a matter of law that this happened at the latest in October 1986. After that time, the statute was running. Points of error one, six, and seven with regard to fraudulent concealment and estoppel are overruled. Points of error eight and nine are moot in light of our holding.

We affirm the judgment of the trial court. Consequently, we do not reach appellee's cross-points.

GREEN, J., concurring without opinion.