SANTANNA NATURAL GAS CORPO-
RATION AND WOMEN'S NATURAL
GAS CORPORATION, Appellants,

v.

HAMON OPERATING COMPANY,
Appellee.

No. 03–97–00104–CV.

Court of Appeals of Texas,
Austin.

Oct. 16, 1997.

Rehearing Overruled Nov. 20, 1997.

Elizabeth G. Bloch, Hilgers & Watkins, P.C., Austin, for Appellants.

J. Robert Beatty, Rodolfo Rodriguez, Jr., Locke Purnell Rain Harrell, Dallas, for Appellee.

Before CARROLL, C.J., and JONES and KIDD, JJ.

KIDD, Justice.

This case is yet another attempt to resolve by summary judgment a case too complex to reduce all material factual disputes to questions of law. Appellants Santanna Natural Gas Corporation and Women's Natural Gas Corporation (collectively "SNG") sued Hamon Operating Company ("Hamon"), Texaco Inc. ("Texaco"), Servco Gas Marketing, Inc., and its successor in interest, Vaquero Gas

Company (collectively "Servco") for conversion, negligent misrepresentation, and unjust enrichment. After settlement was reached with all defendants except Hamon, the district court granted Hamon's fourth motion for summary judgment on three specific grounds: (1) SNG's claims are barred by the statute of limitations; (2) SNG cannot maintain a claim for conversion of money; and (3) SNG cannot establish that it suffered actual monetary damages resulting from Hamon's conduct because the collateral source rule is inapplicable to the present case. We will reverse the judgment and remand the cause to the trial court.

## BACKGROUND

Santanna Natural Gas Corporation and Women's Natural Gas Corporation are sister companies that purchase large volumes of gas from various sources for ultimate resale to markets located primarily in the west and midwest regions of the United States. One source of SNG's gas came from two wells owned and operated by Hamon, called the Greensmith # 1 and # 2 wells (collectively "Greensmith Wells"). However, as discussed below, SNG did not purchase the gas produced by the Greensmith Wells ("Greensmith Gas") directly from Hamon. Instead, SNG purchased the Greensmith Gas from Servco, who at the time had title to, and a right to purchase, all of Hamon's gas produced from the Greensmith Wells.[1] The agreement between Servco and SNG ("Servco/SNG Contract") provided for SNG to purchase all of Servco's gas from the Greensmith Wells, as well as to take title to such gas at the wellhead. The Servco/SNG Contract became effective in December 1988 and expired in December 1990 when Servco's agreement with Hamon ended. Therefore, all gas produced from the Greensmith Wells between December 1988 through December 1990 effectively belonged to SNG.

In order to fully understand the issues raised in this case, one must first understand how SNG transported the Greensmith Gas from the Greensmith Wells to its customers. Once produced, the Greensmith Gas was placed into a gathering system, which was operated by Natural Gas Pipeline Company of America (NGPL). While in the gathering system, the Greensmith Gas was commingled with unprocessed gas from other wells in the gas field. NGPL delivered all the commingled, unprocessed gas to the Camerick Processing Plant (the "Plant"), which was owned and operated by Texaco. At the Plant, Texaco processed the gas by removing its liquefiable hydrocarbons.[2] After processing the raw gas, Texaco placed the remaining gas belonging to SNG into NGPL's main pipeline pursuant to an agreement between NGPL and SNG ("NGPL/SNG Contract"). NGPL then delivered the processed gas to SNG's customers.[3]

Unbeknownst to SNG until SNG discovered otherwise in May 1994, Texaco sold the liquefiable hydrocarbons extracted from SNG's gas and paid Hamon twenty-eight percent of the proceeds from such sales.[4] As

---

1. In September of 1988, Servco contracted with Hamon to purchase a supply of natural gas originating from the Greensmith Wells. The intent of the Hamon/Servco agreement was for Servco to purchase all of Hamon's production from the Greensmith Wells.

2. Liquefiable hydrocarbons include such resources as ethane, butane, and propane.

3. From November 1988 through April 1990, SNG transported the Greensmith gas from the wellhead to its customers under a transport agreement with American Central Gas Marketing ("ACGM"). From May 1990 through December 1990, SNG used NGPL for transporting its gas from the wellhead through the Plant to its customers. Apparently, any disputes SNG had with ACGM were resolved; therefore, we will only discuss SNG's relationship with NGPL.

4. From 1967 through 1986 Texaco and Hamon had an agreement concerning how proceeds from the sale of liquids attributable to the Greensmith Well # 1 would be divided. A division order issued by Texaco and signed by Hamon's predecessor entitled Hamon to a portion of the proceeds from the sale of liquids from Greensmith Well # 1. Because Texaco was unaware of SNG's involvement, it assumed that proceeds from the sale of Greensmith Gas liquids after 1986 from Greensmith Well # 1 still belonged to Hamon. Furthermore, in April of 1990, Hamon misrepresented itself on a division order issued by Texaco as the owner of the gas produced from Greensmith Well # 2. Therefore between 1988 and 1990, Hamon wrongly received from Texaco a portion of the proceeds Texaco derived from the sale of liquids from both Greensmith Wells.

will be discussed later in this opinion, SNG contends that Hamon or its agents: (1) misrepresented itself about its relationship with Texaco in the early part of 1989 and in August 1991; (2) misrepresented itself as the owner of the Greensmith Gas to Texaco in executing a division order issued by Texaco in April 1990; and (3) on several occasions, the last being January 1991, wrongly accepted twenty eight percent of the proceeds from Texaco's sale of liquefiable hydrocarbons extracted from SNG's gas.

Texaco's removal of liquids from the Greensmith Gas also caused problems between SNG and NGPL. NGPL required SNG to nominate[5] gas in two stages: the first nomination would be for volumes of gas produced at the wellheads to be delivered to the Plant; the second nomination would be for volumes of gas received after the gas passed through the Plant to be delivered to SNG's customers. Removing the liquids from the Greensmith Gas reduced the number of MMBtus[6] in each Mcf[7] of the gas. This reduction, also known as "shrinkage," caused an unusual and significant "imbalance" between the gas nominated by SNG for delivery to its customers from the wellhead and the MMBtus actually delivered to NGPL's pipeline from the Plant. However, pursuant to the SNG/NGPL Contract, NGPL always delivered the quantity of gas SNG promised to its customers, and in return, NGPL had the right to demand that SNG make up the imbalances. NGPL sent monthly *estimates* beginning in 1990, showing the imbalances, but the actual imbalances were not available until months, and in some cases years, after the gas had been transported through the pipeline.[8]

Finally in April 1993, NGPL formally advised SNG that actualized measurements showed imbalances large enough to warrant monetary sanctions. However, these actualized measurements again changed in the early part of 1994. Therefore in May 1994, SNG contacted Texaco seeking information concerning these apparent imbalances. At that point, Texaco disclosed its relationship with Hamon regarding the liquefiable hydrocarbons. SNG filed suit in August 1994. Prior to Hamon's summary judgment proceeding, Servco and Texaco settled with SNG for a combined total of $203,800. Without bringing suit against SNG, NGPL accepted $30,000 to settle any dispute over the amount owed for the imbalances under the SNG/NGPL contract.

## STANDARD OF REVIEW

The standards for reviewing a motion for summary judgment are well established: (1) the movant for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference must be indulged in favor of the nonmovant and any doubt resolved in its favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

When a defendant seeks to obtain summary judgment based on a plaintiff's inability to prove its case, the defendant must conclusively disprove at least one element of each of the plaintiff's causes of action. *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991). If the defendant disproves one of the essential elements of a cause of action, the burden shifts to the plaintiff to produce evidence that raises a fact issue as to the negated element. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). Conversely, a defendant seeking summary judgment based on an affirmative defense has the burden of proving

---

5. The term "nominate" means to designate volumes for transportation and/or sale. Nominations are usually estimates since actual volumes are not known until at least one month after production.

6. Natural gas is bought and sold on the basis of its heating content measured in terms of millions of British Thermal units ("MMBtus").

7. The standard volumetric unit for natural gas is the Mcf or thousand cubic feet.

8. Gas accounting is difficult because gas volumes and energy content fluctuate from day to day and a certain amount of volume shrinkage in the pipeline and plant is normal.

conclusively every element of the defense. *See, e.g., Kassen v. Hatley,* 887 S.W.2d 4, 8 (Tex.1994). A defendant is not entitled to judgment as a matter of law on an affirmative defense if the plaintiff supplies evidence such that reasonable minds could differ on any material fact issue relevant to the defense. *See Kassen,* 887 S.W.2d at 9. Because the propriety of a summary judgment is a question of law, we review the trial court's decision *de novo. See Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994).

## DISCUSSION

■ In its first two points of error, SNG argues that the trial court erred in granting Hamon's fourth motion for summary judgment on the ground of statute of limitations because SNG's evidence raised a fact issue with respect to its affirmative defenses to the limitations bar of fraudulent concealment and the discovery rule.[9]

■ A two-year statute of limitations applies to an action for conversion.[10] Tex. Civ. Prac. & Rem.Code Ann. § 16.003 (West 1986); *see Pierson v. GFH Fin. Servs. Corp.,* 829 S.W.2d 311, 314 (Tex.App.—Austin 1992, no writ). Generally, a claim for conversion begins to run at the time of the unlawful taking. *See Pierson,* 829 S.W.2d at 314. To overcome this limitations bar, SNG pleaded that its cause of action for conversion did not accrue because of Hamons's fraudulent concealment.

■ Fraudulent concealment is an equitable doctrine that provides an affirmative defense to the plea in bar of limitations. *See Arabian Shield Dev. Co. v. Hunt,* 808 S.W.2d 577, 584 (Tex.App.—Dallas 1991, writ denied). The gist of the fraudulent concealment defense is the defendant's active suppression of the truth *or* its failure to disclose the truth when it is under a duty to speak. *Leonard v. Eskew,* 731 S.W.2d 124, 128 (Tex.

App.—Austin 1987, writ ref'd n.r.e.) Under the doctrine of fraudulent concealment, the accrual of the plaintiff's cause of action is deferred because a defendant cannot be permitted to avoid liability for its actions by deceitfully concealing wrongdoing until the statute of limitations has run. *See S.V. v. R.V.,* 933 S.W.2d 1, 6 (Tex.1996). The elements of fraudulent concealment are first, actual knowledge by the defendant that a wrong has occurred, and second, a fixed purpose to conceal the facts necessary for the plaintiff to know that it has a cause of action. *See Arabian Shield,* 808 S.W.2d at 584. To establish the affirmative defense of fraudulent concealment, the plaintiff has the burden of putting forth proof which raises an issue of fact with respect to that claim. *See Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996); *American Petrofina, Inc. v. Allen,* 887 S.W.2d 829, 830 (Tex.1994); *Arabian Shield,* 808 S.W.2d at 584.

Hamon reads *Borderlon v. Peck,* 661 S.W.2d 907 (Tex.1983), *Patrick v. Howard,* 904 S.W.2d 941 (Tex.App.—Austin 1995, no writ), *Thames v. Dennison,* 821 S.W.2d 380 (Tex.App.—Austin 1991, writ denied), and *Leonard v. Eskew,* 731 S.W.2d 124 (Tex. App.—Austin 1987, writ ref'd n.r.e.) for the proposition that fraudulent concealment exists *only* when there is a duty to disclose information which may reveal a cause of action. We disagree with Hamon's interpretation of those cases.

■ Fraud is an elusive and shadowy term which has been defined in some cases as any cunning or artifice used to cheat or deceive another. *See Garcia v. Rutledge,* 649 S.W.2d 307, 312 (Tex.App.—Amarillo 1982, no writ). Fraud may consist of *both* active misrepresentation and passive silence. *See generally The American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 435–37 (Tex.1997). Cases cited by Hamon stand for the proposition that a party relying on passive fraud to

---

9. Although SNG pleaded both fraudulent concealment and the discovery rule, we decide these points of error on fraudulent concealment alone. Because application of the discovery rule to this type of case is unsettled, *see Neel v. HECI Exploration Company,* 942 S.W.2d 212 (Tex.App.—Austin 1997, writ granted), we decline at this time to address the issue.

10. SNG's pleadings contain claims for conversion, unjust enrichment, and negligent misrepresentation. Since the major thrust of this appeal concerns the conversion claim, we deal with that cause of action only and express no opinion on the other claims.

sustain a fraudulent concealment defense must demonstrate a special relationship exists which creates a duty to speak. While we agree with Hamon's position in the abstract, we cannot agree that once a party undertakes to speak, as Hamon did in the present case, then that party is permitted to misrepresent the truth. *See Arabian Shield,* 808 S.W.2d at 586; *see also International Sec. Life Ins. Co. v. Finck,* 475 S.W.2d 363, 370 (Tex. App—Amarillo 1971), *rev'd in part on other grounds,* 496 S.W.2d 544 (Tex.1973) (speaker who makes a partial disclosure assumes duty to tell whole truth, even when the speaker was under no duty to make partial disclosure). Under the rule proposed by Hamon, absent a duty to disclose, Hamon, with impunity, could actively deceive SNG. We reject this argument finding the following language from *Borderlon* persuasive:

> Texas courts have long adhered to the view that fraud vitiates whatever it touches, and have consistently held that a party will not be permitted to avail himself of the protection of a limitations statute when by his own fraud he has prevented the other party from seeking redress within the limitations period. To reward a wrongdoer for his own fraudulent contrivance would make the statute a means of encouraging rather than preventing fraud.

*Borderlon,* 661 S.W.2d at 909. We therefore hold that affirmative misrepresentations can support a fraudulent concealment defense to a statute of limitations bar even in the absence of a duty to disclose. *Arabian Shield,* 808 S.W.2d at 586.

Having decided that the doctrine of fraudulent concealment applies, we will now examine whether the evidence in the present case raises an issue of fact as to SNG's fraudulent concealment defense.

■ The record shows at least two events that give rise to disputed *fact issues* concerning SNG's fraudulent concealment defense.

First, in the early part of 1989, SNG began making inquiries about who was processing the Greensmith Gas. Servco, on behalf of SNG, asked Hamon about its involvement with processing the Greensmith Gas. In response, Hamon told Servco it had no relationship with the Camrick Plant.

■ Second, in August 1990, SNG again requested that Servco ask Hamon if Hamon had anything to do with processing the Greensmith Gas. Similar to its 1989 response, Hamon, through Highland Energy ("Highland"),[11] denied any involvement with the processing of the Greensmith Gas. The record shows that this representation was made after Hamon had executed a division order authorizing Texaco to strip and sell liquids from the Greensmith Gas and after Hamon had received checks for a portion of the proceeds from such liquids.

We hold that these two alleged misrepresentations present disputed fact issues concerning the doctrine of fraudulent concealment. *See Cherry v. Victoria Equip. & Supply, Inc.,* 645 S.W.2d 781, 782 (Tex.1983) (ultimate duty to weigh evidence, determine credibility and decide if fraudulent concealment actually exists rests upon trier of fact).

■ However, the doctrine of fraudulent concealment does not extend the statute of limitations indefinitely. *See Arabian Shield,* 808 S.W.2d at 584. Fraudulent concealment merely defers the statute of limitations until the plaintiff learns or in the exercise of reasonable diligence should have learned of the facts that give rise to its cause of action. *See id.* Given that SNG did not actually learn about Texaco's relationship with Hamon's involvement regarding the liquefiable hydrocarbons before May 1994, the crucial issue becomes whether SNG should have discovered the relationship at an earlier time.

---

11. For purposes of this appeal only, Hamon assumed that Highland's statement could be imputed to Hamon. Hamon, however, reserved the right to present evidence as to whether Highland was Hamon's agent when Highland told Servco that Hamon had nothing to do with processing the Greensmith Gas. Hamon also raises questions regarding whether SNG can benefit from alleged misrepresentations to Servco. Because both of these issues are questions concerning agency relationships, which are generally questions of fact when the facts are disputed, we will leave these issues to the trier of fact to decide. *Ross v. Texas One Partnership,* 796 S.W.2d 206, 210 (Tex.App.—Dallas 1990, writ denied).

Hamon contends that as a matter of law SNG should have learned about the conversion at a much earlier time. The essence of Hamon's contention is that a reasonable person would have discovered Hamon's conversion of the liquids extracted from SNG's gas once it learned who was processing the Greensmith Gas. Hamon points out that a letter NGPL sent to SNG in May 1990 informed SNG that its gas flowed through Texaco's processing plant. Therefore, Hamon argues that once SNG discovered Texaco's involvement with processing the gas, and knew that it was not being charged by Texaco for such processing, a reasonable person would have gone directly to Texaco, and not Servco, to find out why there had been such an unusual amount of shrinkage of its gas during processing. Hamon contends that SNG was, in fact, aware of the significant shrinkage as early as August of 1990, as indicated by a letter in which SNG expresses confusion about "lost and unaccounted for volumes" of gas and Texaco's possible "contractual relationship with the working interest owners of the wells."

SNG, on the other hand, contends that only when it actually discovered in May 1994 that Texaco was stripping its gas of liquids *and* paying Hamon proceeds from the sale of the stripped gas did its cause of action accrue. SNG refutes Hamon's argument that it was aware of significant imbalances caused by the processing in 1990. SNG contends that it only realized the significant imbalances when it received NGPL's actualized measurement in April 1993. In SNG's response to Hamon's fourth motion for summary judgment, SNG presented evidence that NGPL had sent only estimates of such imbalances prior to 1993 and that these estimates were not significant enough to raise questions about the imbalances. Furthermore, SNG contends that in addition to the confusion over estimates sent by NGPL, the real reason SNG could not discover its causes of action against Hamon resulted from Hamon's repeated misrepresentations about its involvement with processing the Greensmith Gas.

██ We hold that both contentions involve questions of fact. Determining what a reasonable person would have done or should have known are normally questions of fact. *See Adam Dante Corp. v. Sharpe*, 483 S.W.2d 452, 456 (Tex.1972); *Carter v. Temple–Inland Forest Prods.*, 943 S.W.2d 221, 223 (Tex.App.—Beaumont 1997, no writ h.); *Tri–State v. Barrera*, 917 S.W.2d 391, 397 (Tex.App.—El Paso 1996, writ dism'd) (question of reasonableness is one peculiarly tailored to province of jury). Therefore, since fact issues are present as to when SNG should have learned about Hamon's conversion, we sustain SNG's first two points of error.

██ In its third point of error, SNG argues that the trial court erred in holding as a matter of law that SNG cannot maintain an action for conversion of money. Hamon relies on a line of cases which hold that the conversion of money, as opposed to property, does not state a cause of action for conversion. *See, e.g., Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex.App.—Dallas 1992, writ denied); *Dixon v. State*, 808 S.W.2d 721, 723 (Tex.App.—Austin 1991, writ dism'd w.o.j.); *Crenshaw v. Swenson*, 611 S.W.2d 886, 891 (Tex.App.—Austin 1980, writ ref'd n.r.e.); *Gronberg v. York*, 568 S.W.2d 139, 144 (Tex. Civ.App.—Tyler 1978, writ ref'd n.r.e.). We agree with SNG that this ground for summary judgment mischaracterizes SNG's cause of action against Hamon. SNG sued Hamon for a conversion of SNG's natural gas, natural gas liquids, and the *proceeds* therefrom. The evidence presented to this court indicates that Hamon received proceeds from the sale of extracted liquids from gas it did not rightfully own. Moreover, the evidence shows that Hamon misrepresented itself as the owner of the Greensmith Gas to Texaco on a division order issued by Texaco at a time when Hamon knew it had no title to the gas. Therefore, we hold that the trial court erred in granting Hamon's summary judgment on the ground that SNG's claim was for conversion of money. We sustain SNG's third point of error.

██ In its fourth and fifth points of error, SNG argues that the trial court erred in ruling that the collateral source rule was inapplicable to the present case and that SNG suffered no monetary damages from

the various torts allegedly committed by Hamon. Hamon contends that all SNG was buying from the Greensmith Wells was a quantity of MMBtus to be delivered to its customers. Therefore, Hamon argues that because the NGPL/SNG contract required NGPL to make up any deficiencies from gas transported from the Plant to SNG's customers and then charge such deficiencies to SNG at a later point in time, the only damage SNG suffered was what it had to pay NGPL for the shortages, namely $30,000. Hamon argues that because SNG collected $192,500 from Texaco and $11,300 from Servco, the one satisfaction rule prevents SNG from recovering anything against Hamon. Under the one satisfaction rule, a plaintiff cannot obtain more than one recovery for the same injury. *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 7 (Tex.1991).

SNG, on the other hand, argues that the proper measure of damages for conversion is the value of the property converted at the time and place of the conversion. *See United Mobile Networks, L.P. v. Deaton,* 939 S.W.2d 146, 147–48 (Tex.1997); *Humes v. Hallmark,* 895 S.W.2d 475, 478–79 (Tex. App.—Austin 1995, no writ). SNG argues that its agreement with NGPL is similar to an insurance policy and therefore, under the collateral source doctrine, Hamon is not entitled to take advantage of SNG's favorable $30,000 settlement with NGPL.

Our task is to apply legal principles to these arguments in the context of a summary judgment. Our first conclusion is that SNG's actual damage from Hamon's conversion is measured by the value of the gas and liquid hydrocarbons that Hamon converted. *Deaton,* 939 S.W.2d at 147–48. The record shows that while Hamon received about $125,000 from the sale of SNG's liquids, this figure only represents 28% of the proceeds from the liquids that were actually converted. Therefore, the value of the converted gas could approach approximately $450,000. However, the question of actual damages is for the trier of fact. At trial,

Hamon would be entitled to any defenses in addition to settlement credits that SNG received from Texaco and Servco. However, we are unwilling to hold as a matter of law that SNG has no claim for conversion damages because of its settlement with Texaco and Servco.

Having concluded that SNG's actual damage from Hamon's alleged conversion is the value of liquids converted, we disagree with Hamon's contention that SNG's $30,000 payment to NGPL constitutes a ceiling on SNG's actual damages. Irrespective of the label placed upon the agreement between SNG and NGPL, the contract is collateral to Hamon's alleged conversion of the gas, title to which belonged to SNG from the wellhead to delivery to SNG's customers. Therefore, we conclude that Hamon, as a potential tortfeasor, cannot take advantage of the agreement entered into between SNG and NGPL. *See Deaton,* 939 S.W.2d at 148. However, on the trial of this case, SNG should not be permitted to allege as part of its damages the $30,000 it paid to NGPL for the shortages. Having made its election to proceed for conversion damages, SNG should not be allowed to seek additional damages under its collateral agreement with NGPL. *Id.* Therefore we sustain SNG's points of error four and five and conclude that Hamon has not established, as a matter of law, that SNG cannot prove some amount of recoverable conversion damages at trial.

## CONCLUSION

Having sustained all of SNG's points of error, we reverse the trial court's summary judgment and remand this cause to the trial court for further proceedings.