Opinion issued February 25, 2010 



















In The
Court of Appeals
For The
First District of Texas




NO. 01-08-00713-CV




SHELL OIL COMPANY AND SWEPI LP D/B/A SHELL WESTERN E&P,
SUCCESSOR IN INTEREST TO SHELL WESTERN E&P, INC., Appellants

V.

RALPH ROSS, Appellee
 

 
 
On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Cause No. 2003-17162
 

 
 
O P I N I O N
          Appellants, Shell Oil Company (“Shell Oil”) and Shell Western E&P (“Shell
Western”) (collectively “Shell”), challenge the trial court’s judgment, entered after
a jury trial, in favor of appellee, Ralph Ross, in Ross’s suit against Shell for breach
of contract, unjust enrichment, and fraud concerning the underpayment of oil and gas
royalties to Ross’s grandmother, Gertrude T. Reuss. Shell presents six issues for our
review. In its fourth issue, Shell contends that the trial court erred in entering
judgment and denying Shell’s motion for judgment notwithstanding the verdict in
which Shell asserted that it properly used a “weighted average price” in calculating
the royalty payments it made to Ross and his predecessors (collectively “the Rosses”).
 In its first, second, third, and fifth issues, Shell contends that the trial court erred in
denying its motions for directed verdict and for judgment notwithstanding the verdict
in which Shell asserted that the evidence is legally insufficient to support the jury’s
finding that Shell fraudulently concealed its underpayment of royalties to the Rosses
and the jury’s findings on when the Rosses should have discovered Shell’s
underpayment of royalties. In its sixth issue, Shell contends that the trial court erred
in not including Shell’s proposed instruction on constructive notice in the jury charge.
           We affirm.
Factual and Procedural Background
          In his fifth amended petition, Ross alleged that he is the “current owner of one-third of the mineral interests reserved” in the Oil, Gas and Mineral Lease that Shell
Oil and G.T. Reuss and Gertrude T. Reuss entered into on August 22, 1961 (the
“Reuss Lease”). Ross claimed that Shell is “expressly obligated under the [Reuss]
Lease to pay . . . an undivided 1/8 royalty, valued in accordance with the royalty
provisions, . . . [which state that the] valuation of the royalty on unprocessed gas is
based on ‘. . . the amounts realized . . .’ from sales of the gas.” Because Shell “failed
to pay royalty in accordance with the express royalty provisions and covenant of the
[Reuss] Lease,” Shell “breached the express obligations under the lease.” Ross also
claimed that Shell “created a fraudulent scheme to deprive [Ross] of royalties” by
paying royalties “based on an arbitrary amount even below the internal transfer
price.” Shell “concealed this scheme by sending statements with [Ross’s] royalty
checks that contained false representations that the royalties were based on the actual
sales prices.”
          At trial, Bryan Garrison, who managed Shell’s royalty payment obligations
from “1995 to around 2000,” testified that Shell Oil “originally assumed the
obligations to pay royalties under the [Reuss Lease].” Garrison agreed that, under the
Reuss Lease, Shell was obligated to pay, as a royalty, one-eighth of the market value
of the natural gas realized at the mouth of the well. Shell divided this one-eighth
royalty payment between the Reusses and the State of Texas, so Shell was ultimately
obligated to pay the Reusses “1/16th of the amount realized at the mouth of the well.” 
Garrison explained that under the Reuss lease, Shell is required to calculate and pay
the royalty based upon the sale price of the natural gas. 
          Garrison noted that in making royalty payments to the State of Texas, Shell
reported the sale price of the natural gas to the Texas General Land Office (“Land
Office”), where “you can look at the records.” However, he conceded that the actual
receipts were in Shell’s possession and not publicly available and the “amount paid
to the State can very well be quite different than . . . what the Reuss landowners were
entitled to.”
          Garrison further testified that in 1970, Shell entered into the Lasater pooling
agreement with Forest Oil. Under the pooling agreement, Shell and Forest Oil
allocated the natural gas produced from a well on the Lasater’s property based on the
amount of land that they contributed to the agreement. Based on the share of land
that Shell contributed,


 it received 62.5% of the natural gas produced by the Lasater
well. Thus, as per Garrison, if the Lasater well produced 10,000 mcf


 of natural gas,
Shell received 6,250 mcf of natural gas and Forest Oil received 3,750 mcf. 
          Garrison explained that in order to calculate the royalty payments on gas
produced from the Lasater well, Shell did not use the price that it realized from
selling the natural gas. Instead, Shell used a “weighted average price,” which it
calculated by weighting its sale price and Forest Oil’s sale price, according to their
respective shares of gas, and then averaging these weighted prices. For example, if
the Lasater well produced 10,000 mcf of natural gas and Shell sold its share of the
natural gas for $1.20 per mcf and Forest Oil sold its share of the natural gas for $.90
per mcf, then Shell would “weight the average” by giving “the $1.20 price the weight
of 6,250” and “the 90-cent price a weight of 3,750.” Thus, Shell would have paid
royalties to the Rosses based on a price closer to “90 cents than $1.20.” Shell
stipulated that from January 1988 through February 1997, Shell had paid the Rosses
approximately $60,000 less by using the weighted average price than if Shell had
used its sale price. Garrison agreed that the Reuss Lease does not state that “Shell
can pay Ms. Reuss based on a weighted average or blended price.”
          In 1983, Shell Oil formed Shell Western and transferred a number of active oil
and gas leases, including the Reuss Lease, to Shell Western, which assumed all
obligations under the leases. 
          In October 1995, Shell sent a letter to 2,246 royalty owners in Texas with an
enclosed check. In the letter, Shell stated that it had enclosed the check as “an
adjusted calculation for the period from September, 1986 through August, 1995.” 
Shell also stated that it had made this “retroactive adjustment as a result of disputes
that [had] arisen with a few of [its] royalty owners” because Shell had been
calculating royalties based on the transfer price to Shell Gas Trading Company
(“SGT”) instead of the price Shell actually realized from its sale to a third party. 
Shell further stated that the check amount reflected “the difference between index
prices and the net prices [SGT] received from third parties, plus interest.” However,
Garrison explained that the “letter did not disclose . . . that [Shell] had not in the past
even been paying the transfer price.” 
          Shell also indicated in the letter that “future royalty payment calculations
[would] be based upon the net prices the new venture receives from third parties for
the gas.” Garrison explained this to mean that, according to the letter, future royalty
calculations would be based on what Shell “sold the gas for in an arm’s-length sale.” 
However, Garrison conceded that, after sending this letter, Shell continued to pay
royalties based on an amount that was less than “the transfer price, [and] much less
[than] the third-party sale price, despite the representation in this letter.” Garrison did
not discover this underpayment until after his first deposition. He had understood
that a letter had been sent to Shell’s accounting department with “specific instructions
on how to pay the royalty owners” in accordance with the October 1995 letter. 
          Garrison further testified that if any of the Rosses had called Shell with
questions about the methods used to calculate their royalties, Shell would have
provided them with “information, pricing, volumes, and value.” He had reviewed his
telephone call log and “found no evidence that anybody had called concerning [the
Rosses].”
          Robert Bridges, a Shell employee, testified that he supervised his staff in
setting the transfer price of natural gas sold by Shell Western. In setting the transfer
price, he attempted to “protect the Shell house with a very clear, transparent
methodology of pricing that would be fair.” Bridges agreed that in protecting the
“Shell house,” he was both “representing [Shell Western], the [Shell] affiliate; and
. . . representing the purchaser, [SGT].” He also agreed that the transfer price was
unrelated to “what the gas was actually sold for by SGT.”
          Ross’s father, Ralph Louis Ross, the son of G.T. Reuss and Gertrude T. Reuss,
testified that he administered his mother’s oil and gas interests beginning in 1980. 
Ross’s father did not learn that Shell had been underpaying the royalties due under
the Reuss Lease until sometime in 2002, when David Scott, an attorney who had
formerly been employed by the Land Office, informed him that the Land Office had
received a settlement from Shell based on underpayment of royalties on natural gas
produced from the Reuss tract. When he learned of the underpayment, Ross’s father
assigned “all legal rights that the estate had,” including the rights to pursue a lawsuit
against Shell, to Ross. The royalty statements sent by Shell included the unit price
of the natural gas, which Ross’s father understood to be the price that Shell received
from selling the gas to a third party. Ross’s father explained that he did not remember
receiving the October 1995 letter from Shell. 
          Charles Graham, Ross’s expert witness, testified that under the Reuss Lease,
Shell should have made royalty payments based on the price that Shell “actually sold
the gas for.” He explained that the Rosses would not have known that their royalty
payments were incorrect even had they known that the Land Office’s royalty
payments differed from the Rosses’ payments because the Land Office is “free to
negotiate a different royalty obligation with Shell.” The only documents which
indicated to Graham that the Rosses had been underpaid were Shell and El Paso
Natural Gas internal documents, which were not publicly available. Graham noted
that the published gas price index is an estimated value of gas prices on average
during a period of time and would not reflect the selling price that Shell actually
received for its gas. 
          Graham further testified that from 1994 through 1997, Shell had used an
arbitrary price to calculate the Reusses’ royalty payments. He calculated that this
resulted in an underpayment of $10,000.78. Additionally, Shell had improperly used
a weighted average price to calculate the Reusses’ royalty payments from 1988
through 1997 for the Lasater and Houston wells. Graham calculated that this had
resulted in an underpayment of $62,531.31. 
          John Berghammer, Shell’s expert witness, testified that Shell’s use of a
“weighted average/blended price” calculation “was appropriate, and also . . .
completely consistent with . . . industry practice for the same sort of an accounting
situation involving unit or pooled-type production.” He explained that some oil and
gas publications collect price information and set an index, which can be used to
approximate the price of gas in an area. Also, the El Paso Permian Basin Index,
published privately, is commonly used in the area of the Reuss tract. When
Berghammer compared the price used to calculate the Rosses’ royalty payments and
compared that price to the index, he determined that the unit price on the royalty
statements from 1988 to 1993 was “obviously” much lower than the index price.
          Before presenting their closing arguments to the jury, the parties provided the
trial court with stipulations regarding damages calculations. They stipulated that if
limitations did not bar Ross’s claims, his damages were at least $10,000.78 based on
the underpayment of royalties. The parties further stipulated that if Shell’s use of a
weighted average price in calculating royalties had breached the Reuss Lease, then
Ross’s damages were $72,532.09, plus interest. 
          The trial court found, as a matter of law, that Shell had “breached the contract
with [Ross] as it relates to the ‘weighted average/blended price’ issue.” The jury
found that Shell had fraudulently concealed its “fail[ure] to pay royalties between
1994 and 1997 for reasons other than the ‘weighted average/blended price’ issue” and
that the Rosses should have discovered this underpayment, in the exercise of
reasonable diligence, in “2002.” The jury also found that Shell had fraudulently
concealed its “fail[ure] to pay royalties between 1988 and April 1994 because of the
‘weighted average/blended price’ issue” and the Rosses should have discovered this
underpayment, in the exercise of reasonable diligence on “Feb. 6, 2006.” 
          Based on the jury’s fraudulent concealment findings, the trial court ordered that
Ross recover actual damages of $72,532.09, prejudgment interest, attorneys’ fees, and
court costs.
Weighted Average Calculation of Royalty Payments
          In its fourth issue, Shell argues that the trial court erred in concluding that Shell
breached the Reuss Lease by using a weighted average royalty calculation


 because
paragraph 13 of the Reuss Lease indicates that the royalty payments should be
calculated based on the sale price of the natural gas sold by Shell and any other
working interest owners.
          When a written contract is not ambiguous, the trial court should interpret the 
contract as a question of law. MCI Telecomms. Corp. v. Tex. Utils. Elec. Co., 995
S.W.2d 647, 650–51 (Tex. 1999). We review the trial court’s legal conclusions de
novo. Id. Here, the parties do not contend that the contract is ambiguous, nor do they
dispute the relevant facts. The parties have stipulated that if Shell’s use of a weighted
average royalty calculation violates the Reuss Lease then it underpaid the Reusses by
$72,532.09.
          Paragraph 13(a) of the Reuss Lease allows Shell to “pool or unitize all or any
part of [the Reusses’] land.” In 1968, Shell entered into a pooling and unitization
agreement with Marathon Oil and Forest Oil, under which it pooled 320 acres of the
Reuss tract into the Houston Unit. Then, in 1970, Shell entered into another pooling
and unitization agreement with Forest Oil, under which it pooled 240 acres of the
Reuss tract into the Lasater Unit. 
          For both the Houston and Lasater wells, Shell received its share of the natural
gas produced, based on the amount of land it contributed to the pooled unit, and sold
the gas to third parties. For example, Shell received 62.5% of the natural gas
produced by the Lasater well because it had contributed 62.5% of the land to the
Lasater Unit. When Shell calculated the royalty payment due to the Reusses, it did
not calculate the royalty payment based on the price that Shell received for the gas. 
Instead, Shell calculated the weighted average price of all the gas produced at the
mouth of the well by averaging the sale price that it had received with the sale prices
that any other working interest owners, e.g., Forest Oil, had received. Before
averaging the sale prices, Shell first weighted the working interest owner’s sale prices
based on their respective shares of the natural gas.
          Shell argues that paragraph 13(b) of the Reuss Lease demonstrates that its
weighted average calculation of the unit price is permitted because this “provision
does not say that it was only that portion produced and sold by [Shell Western]; in
fact, the implication is that it is the defined portion of all of the production, including
that sold by the other working interest owners.” 
          Paragraph 13(b) controls the allocation of natural gas to the Reuss tract when
included in a larger, unitized tract of land:
Any operations conducted on any part of such unitized land shall be
considered, for all purposes, except for the payment of royalty,
operations conducted under this lease. There shall be allocated to the
land covered by the lease included in any such unit that proportion of
the total production of unitized minerals from wells in the unit, after
deducting any used for lease or unit operations, which the number of
surface acres in the land covered by this lease included in the unit bears
to the total number of surface acres in the unit. The production so
allocated shall be considered for all purposes, including the payment or
delivery of royalty, overriding royalty, and any other payments out of
production, to be the entire production of unitized minerals from the
portion of said land covered hereby and included in such unit in the
same manner as though produced from said land under the terms of this
lease.
(Emphasis added.) This provision requires that Shell pay the Reusses’ royalty based
on the production of natural gas allocated to the Reuss tract. The provision further
provides that the amount of natural gas allocated to the Reuss tract should represent
the percentage of the natural gas produced that corresponds to the percentage of “the
total number of surface acres in the unit” contributed by the Reuss tract. However,
nothing in this provision addresses how the natural gas, so allocated, should be
valued for purposes of royalty payments. Instead, the provision states that royalty
payments should be made “in the same manner as though produced from said land
under the terms of this lease.”
          Under paragraph 4 of the Reuss Lease, Shell agreed to pay royalties to the
Rosses,
. . . on gas and casinghead gas produced from [the Reuss tract] (1) when
sold by [Shell], one-eighth of the amount realized by [Shell] computed
at the mouth of the well, or (2) when used by [Shell] off said land or in
the manufacture of gasoline or other products, the market value, at the
mouth of the well, of one-eighth of such gas and casinghead gas.” 
Shell argues that the royalty payment should be calculated based on the amount
realized by all the working interest owners who are part of the pooling and unitization
agreement because each working interest owner received a portion of the natural gas
“produced from” the Reuss tract. However, the Reuss Lease expressly requires Shell
to calculate royalty payments based on the amount realized by Shell. It does not
contain any language that would allow Shell to calculate royalty payments based on
the amount realized by any other working interest owner. In using a weighted
average calculation, Shell, to its benefit, calculated the Reusses’ royalty payments in
a manner that contradicts the express language of the contract. 
          Due to the fluid character of natural gas, the working interest owners could not
divide the gas among themselves based on which contributing tract produced the gas. 
Instead, they decided to allocate the gas in proportion to the percentage of land
contributed by that working interest owner. Similarly, paragraph 13(b) of the Reuss
Lease allocates the gas on which Shell pays a royalty to the Reusses in proportion to
the percentage of land contributed by the Reuss tract. Although the natural gas that
Shell received from the unitized tract could not be identified specifically and uniquely
with production from the Reuss tract, the amount of natural gas allocated to Shell
from the unitized tract is directly proportional to the amount of land it contributed to
the unitized tract. Therefore, in the context of the Reuss Lease and this pooling and
unitization agreement, the natural gas that Shell sold was produced from the Reuss
tract.
          By calculating the Reusses’ royalties based on a weighted average price, Shell
breached its contract by paying royalties on a price less than the amount that Shell
realized from the sale of the gas. Accordingly, we hold that the trial court did not err
in concluding that Shell breached its contract with the Reusses by paying royalties
based on a weighted average price.
          We overrule Shell’s fourth issue.
Fraudulent Concealment
          In its first and second issues, Shell argues that the trial court erred in denying
its motions for a directed verdict and for judgment notwithstanding the verdict
because the evidence is legally insufficient to show that Shell fraudulently concealed
its underpayment of royalties to the Rosses.
          We will sustain a legal sufficiency or “no-evidence” challenge if the record
shows one of the following: (1) a complete absence of evidence of a vital fact, (2)
rules of law or evidence bar the court from giving weight to the only evidence offered
to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a
scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. 
City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal
sufficiency review, a “court must consider evidence in the light most favorable to the
verdict, and indulge every reasonable inference that would support it.” Id. at 822. 
If there is more than a scintilla of evidence to support the challenged finding, we must
uphold it. Formosa Plastics Corp. USA v. Presidio Eng’rs & Contractors, Inc., 960
S.W.2d 41, 48 (Tex. 1998). If the evidence offered to prove a vital fact is so weak
that it only creates a “mere surmise or suspicion” of the existence of the fact, “the
evidence is no more than a scintilla and, in legal effect, is no evidence.’” Ford Motor
Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004) (quoting Kindred v. Con/Chem,
Inc., 650 S.W.2d 61, 63 (Tex. 1983)). However, if the evidence at trial would enable
reasonable and fair-minded people to differ in their conclusions, then jurors must be
allowed to do so. Keller, 168 S.W.3d at 822; see also King Ranch, Inc. v. Chapman,
118 S.W.3d 742, 751 (Tex. 2003). We may not substitute our judgment for that of
the trier-of-fact “so long as the evidence falls within this zone of reasonable
disagreement.” Keller, 168 S.W.3d at 822.
          Generally, a defendant’s fraudulent concealment of wrongdoing will toll the
running of limitations. Kerlin v. Sauceda, 263 S.W.3d 920, 925 (Tex. 2008) (citing
Shah v. Moss, 67 S.W.3d 836, 841 (Tex. 2001)); see also Seureau v. ExxonMobil
Corp., 274 S.W.3d 206, 228 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (“[T]he
fraudulent-concealment doctrine is an affirmative defense to limitations that
resembles equitable estoppel”). To prove fraudulent concealment, a plaintiff must
show that the defendant actually knew a wrong occurred, had a fixed purpose to
conceal the wrong, and did conceal the wrong. Shah, 67 S.W.3d at 841; see also
Seureau, 274 S.W.3d at 228 (stating that plaintiff must demonstrate defendant had
“(1) actual knowledge that a wrong occurred, (2) a duty to disclose the wrong, and (3)
a fixed purpose to conceal the wrong”); Santanna Natural Gas v. Hamon Operations,
954 S.W.2d 885, 890 (Tex. App.—Austin 1997, pet. denied) (defining elements of
fraudulent concealment as “first, actual knowledge by the defendant that a wrong has
occurred, and second, a fixed purpose to conceal the facts necessary for the plaintiff
to know that it has a cause of action”). Accordingly, the “gist of the fraudulent
concealment defense is the defendant’s active suppression of the truth or its failure
to disclose the truth when it is under a duty to speak.” Hay v. Shell Oil Co., 986
S.W.2d 772, 778 (Tex. App.—Corpus Christi 1999, pet. denied).
          Importantly, however, fraudulent concealment will not “bar limitations when
the plaintiff discovers the wrong or could have discovered it through the exercise of
reasonable diligence.” Kerlin, 263 S.W.3d at 925; see also Shah, 67 S.W.3d at 841
(“Fraudulent concealment tolls limitations until the plaintiff discovers the fraud or
could have discovered the fraud with reasonable diligence.”). Determining when a
plaintiff knew or reasonably should have known of the cause of action is normally a
question of fact. Santanna Natural Gas, 954 S.W.2d at 892.
          In its first issue, Shell asserts that there is no evidence of the Rosses’ “reliance
on the October 18, 1995 letter.” Garrison testified that Shell sent the October 1995
letter to “2,246 Texas royalty owners,” but no one testified that the Rosses were
among the royalty owners to whom Shell sent the letter. Ross’s father testified that
if Shell had sent the letter to the Rosses, he would have received the letter on his
mother’s behalf because in 1980, when his mother moved to Florida, he began
receiving her royalty checks and depositing them for her. However, Ross’s father did
not remember ever having received the letter, and he stated that he had not relied on
it. Additionally, the copy of the letter in the record is addressed to “Royalty Owner,”
not specifically to the Rosses. 
          Viewing the evidence in the light most favorable to the verdict, we hold that
there is no evidence that the Rosses received or relied upon the October 1995 letter. 
Nevertheless, the trial court did not err in denying Shells’ motions for directed verdict
and judgment notwithstanding the verdict if the check stubs that Shell enclosed with
its royalty statements support a finding of fraudulent concealment.
          In its second issue, Shell asserts that there is no evidence that the Rosses relied
on Shell’s royalty statements or that “[Shell] knew that the ‘unit price’ on the Reuss
check stubs was not the ‘transfer price.’” Shell also asserts that the Rosses “could
have, with the exercise of reasonable diligence, discovered that the ‘unit price’ on the
Reuss check stubs did not reflect the ‘transfer price’ once Reuss received the October
18, 1995 letter.” Shell contends that it had no “duty to state or disclose the exact
price [it] received in an arms’ length sale” in its royalty statements. 
          First, because there is no evidence that the Rosses received the October 1995
letter, the Rosses could not have discovered that the unit price in the royalty
statements did not reflect the transfer price based on the October 1995 letter.
          Second, regarding Shell’s assertion that there is no evidence that the Rosses
relied on the royalty statements, Ross’s father testified that Shell usually enclosed
royalty statements with his mother’s royalty checks. He explained that he believed
that the royalty statement provided a unit price of the gas that represented “whatever
it was sold for.” He did not “expect that [Shell] could pay [him] just any price they
wanted to.” Viewing the evidence in the light most favorable to the verdict, we hold
that the evidence is legally sufficient to support the jury’s implied finding that Ross’s
father relied on Shell’s misrepresentations in the royalty statements regarding the unit
price of the gas. 
          Third, regarding Shell’s assertion that there is no evidence or insufficient
evidence that Shell knew that its royalty statements contained misrepresentations and
that it knowingly underpaid royalties, we note that the evidence reveals that Shell
underpaid royalties in at least two separate ways over a course of many years. There
is evidence that Shell engaged in a practice of underpaying royalties by paying an
arbitrary price, which was even different than an internal transfer price that Shell may
have intended to base the price upon. There is also evidence from which a reasonable
juror could conclude that Shell purposefully set up the internal transfer price as part
of an effort to underpay royalties for its own benefit. In regard to the October 1995
letter, although there is no evidence that the Rosses received or relied upon the letter,
the jury could have considered it as some evidence of Shell’s continuing knowledge
that it was underpaying royalties. Moreover, there is also evidence that, even after
issuing the October 1995 letter to a number of royalty owners, Shell continued to
underpay royalties owed to the Rosses and that it based the amounts of its payments
on an arbitrary price. 
          In addition to the evidence showing that Shell had underpaid royalties in
violation of the lease based upon an arbitrary price, there is also evidence, as
discussed above, that Shell underpaid royalties using a “weighted average price”
rather than the contracted-for actual price. Based upon the evidence presented, the
jury could have reasonably concluded that this weighted average price was
unauthorized under the lease. Although Shell argued that the lease should have been
interpreted to authorize such a pricing mechanism, the jury was free to completely
reject this and reasonably conclude that this mechanism was used by Shell to conceal
the actual amount of royalty payments owed under the plain language of the lease and
that Shell continued to make underpayments over the course of many years.
          Finally, Shell argues that “an incorrect ‘value’ or ‘unit price’ reflected on a
royalty owner’s check stub cannot be fraudulent concealment” because Shell had no
“duty to state or disclose the exact price [it] received in an arms’ length sale” in its
royalty statements. Ross argues that Shell had a duty to disclose “the actual sale price
of [the] gas” because “the Natural Resources Code requires disclosure of the sale
price of the gas under a proceeds lease.” 
          When a person makes a payment to “a royalty interest owner from the proceeds
derived from the sale of oil or gas production . . . the person making the payment shall
include” certain information in a “check stub or on an attachment to the payment
form.” Tex. Nat. Res. Code Ann. § 91.501 (Vernon Supp. 2009). The check stub
or attachment must include, among other things, the unit price, i.e., “the price per
barrel or per MCF of oil or gas sold.” Id. § 91.502 (Vernon Supp. 2009). However,
the unit price may vary depending on the method used to calculate its price. See
Yzaguirre v. KCS Res., Inc., 53 S.W.3d 368, 372 (Tex. 2001). For example, the unit
price of gas may be calculated based on its market value or on the amount realized
from its sale. See id. “Market value may be wholly unrelated to the price the lessee
receives as the proceeds of a sales contract.” Id. The statute does not explain
whether the price of the oil or gas should be calculated based on market value, the
amount realized, or some other method; nevertheless, the statute certainly requires
that the royalty statement include the price of the gas sold, not an arbitrary number. 
See Tex. Nat. Res. Code Ann. § 91.502. 
          Viewing the evidence in the light most favorable to the verdict, the unit price
that Shell provided in its royalty statements did not reflect the price of the gas sold
according to any method of calculation. Garrison testified that the unit price that
Shell provided in its royalty statement, and used to calculate the Reuss royalties, was
lower than both the “third-party sale price” and the transfer price. Additionally,
Berghammer, Shell’s expert witness, testified that the unit price “wasn’t even close
to being reflective of the index prices.” Shell did not present any evidence that the
unit price it provided in the Reuss royalty statements reflected the actual price of the
gas sold using any method of calculation. Shell did have a duty to provide a unit
price that was not arbitrary, and the evidence is legally sufficient to show that the unit
price represented in the royalty statements did not reflect the actual price of the gas
sold.
          Accordingly, we hold that the trial court did not err in denying Shell’s motions
for a directed verdict and for judgment notwithstanding the verdict on the ground that
the evidence is legally insufficient to show that Shell fraudulently concealed its
underpayment of royalties to the Rosses.
          We overrule Shell’s first and second issues.
 
Limitations
          In its third and fifth issues, Shell argues that the trial court erred in denying its
motion for judgment notwithstanding its verdict because there is no evidence to
support the jury’s finding that the Rosses, “in the exercise of reasonable diligence,
[should] have discovered that Shell failed to pay royalty in accordance with the Reuss
Lease” for royalty payments “between 1994 and 1997 for reasons other than the
‘weighted average/blended price’ issue” in 2002 and “between 1988 and April, 1994
because of the ‘weighted average/blended price’ issue” in “Feb. 6, 2006.” Shell
argues that the Rosses should have discovered Shell’s underpayment of royalties
sooner through the exercise of reasonable diligence because (1) the October 1995
letter provided the Reusses’ with notice that Shell had been calculating their royalties
on the basis of index prices, not sale prices; (2) the prices used to calculate the Land
Office’s royalties were different than the prices used to calculate the Reusses’
royalties; and (3) the prices used to pay royalties on the Lasater and Houston wells,
which were subject to the unitization and pooling agreements, were substantially
lower than the prices on the other two wells. 
          Ross’s breach of contract claim is governed by a four-year statute of
limitations. Tex. Civ. Prac. & Rem. Code Ann. § 16.051 (Vernon 2008); Stine v.
Stewart, 80 S.W.3d 586, 592 (Tex. 2002). The limitations period begins to run when
a contract is breached. Stine, 80 S.W.3d at 592. However, a defendant’s fraudulent
concealment of the breach tolls the statute of limitations until the fraud is discovered
or should have been discovered with reasonable diligence. Kerlin, 263 S.W.3d at
925. 
          A party should discover a defendant’s fraudulent concealment when the party
learns of facts, conditions, or circumstances which would cause a reasonably prudent
person to make inquiry, which, if pursued, would lead to discovery of the fraud. 
Borderlon v. Peck, 661 S.W.2d 907, 909 (Tex. 1983). “Knowledge of such facts is
in law equivalent to knowledge of the cause of action.” Id.
          First, having held that there is no evidence that the Rosses received the October
1995 letter, we conclude that there is no evidence that the letter provided the Rosses
with facts which would cause a reasonably prudent person to make an inquiry which
would lead to a discovery of the fraud. See id. 
          Second, regarding the difference between the gas prices used to calculate the
Land Office’s royalties and those used to calculate the Reusses’ royalties, there is no
evidence that any of the Rosses learned that Shell was using a higher price to
calculate the royalties it paid to the Land Office than it used to calculate the Reusses’
royalties. Thus, the Rosses could not have discovered Shell’s fraudulent concealment
merely because the Land Office received royalties on a higher gas price absent their
knowledge of these facts. 
          Finally, regarding the lower unit prices of the Lasater and Houston wells, Shell
provided the unit price information for the Reusses’ wells in the royalty statements. 
Shell asserts that if Ross’s “father looked carefully at the [statements], he would have
seen there was a significant difference in the prices [Shell Western] used to pay
royalties for the Lasater and Houston wells.” In support of its argument that this fact
would have caused a reasonably prudent royalty owner to inquire why these unit
prices were lower, Shell relies on three cases: Kerlin, 263 S.W.3d 920; Wagner &
Brown, Ltd. v. Horwood, 58 S.W.3d 732 (Tex. 2001); and HECI Exploration Co. v.
Neel, 982 S.W.2d 881 (Tex. 1998). 
          In Kerlin, the Texas Supreme Court determined that the plaintiff, Sauceda, or
her predecessors in interest, should have discovered the existence of her claims
through the exercise of due diligence, even though the defendant, Kerlin, had
fraudulently concealed the basis of the claims. Kerlin, 263 S.W.3d at 925. In 1937,
Kerlin had contacted Primitivo Balli, who assisted him in collecting, from various
family members, eleven general warranty deeds containing a reserved royalty interest. 
Id. at 922. Kerlin told the family members that he would use the deeds “to clear title
to Padre Island, and that each deed would reserve a 1/64th of 1/8th royalty in each
grantor.” Id. In an ensuing lawsuit, Kerlin and his opposing parties reached a
settlement agreement under which Kerlin received “the mineral interests in 1,000
acres of Padre Island located in Nueces County and fee simple title to 20,000 acres
of land in the southern division of the island.” Id. at 923. In 1953, thirteen years
after the settlement agreement was reached, Primitivo Balli wrote two letters to Kerlin
requesting documents showing Kerlin’s interest in Padre Island. Id. Kerlin
responded that he had not received title under the Ballis’ deeds and that the Ballis had
no claim to the land. Id. In 1985, a descendant of one of the Balli deed-holders,
contacted Kerlin about the mineral interests reserved in the Balli deeds. Id. at 924. 
“Kerlin told her that the deeds were invalid, and that she would have the burden of
proof in an expensive, time-consuming lawsuit to prove otherwise.” Id. 
          In evaluating the circumstances in Kerlin, the court reasoned that “Kerlin’s
receipt of more than 20,000 acres in fee simple and 1,000 mineral acres were matters
of public record more than forty years before the Ballis filed this lawsuit” and the
Ballis “were on notice that the warranty deeds their predecessors executed contained
royalty reservation, yet they never received any royalties”; therefore, “[a]s a matter
of law, the Ballis could have discovered the existence of any claims before limitations
expired through the exercise of reasonable diligence.” Id. at 926.
          We note that, in Horwood and HECI, the Texas Supreme Court analyzed the
discovery rule, not the doctrine of fraudulent concealment.


 Horwood, 58 S.W.3d
at 734–35; HECI, 982 S.W.2d at 886–87. However, in Kerlin, the supreme court
determined that its prior discovery rule cases were “instructive” in addressing the
defense of fraudulent concealment and, more specifically, in determining when a
plaintiff could discover claims through the exercise of reasonable diligence. See
Kerlin, 263 S.W.3d at 925–26 (“Like fraudulent concealment, the discovery rule does
not apply to claims that could have been discovered through the exercise of
reasonable diligence. While the discovery rule differs from fraudulent concealment
in that its applicability is determined on a categorical basis, HECI is nevertheless
instructive in this case.”). Accordingly, we agree with Shell that we should consider
Horwood and HECI in our analysis of the applicability of fraudulent concealment. 
          In Horwood, royalty owners brought claims against a lessee for the
underpayment of royalties as a result of the lessee’s allegedly improper post-production charges that appeared on royalty statements that were provided to the
owners. 58 S.W.3d at 736–37. In determining the applicability of the discovery rule,
the supreme court noted that royalty owners have “some obligation to exercise
reasonable diligence in protecting their interests,” they may not rely on implied
covenants to dispense with the need to exercise due diligence in enforcing their
contractual rights, they should exercise due diligence to determine whether charges
made against royalty payments are “proper and reasonable,” and they should be
“alerted to the need to perform additional investigation to protect their interests”
when they receive statements listing fees charged. Id. at 735–36. The court further
noted that royalty owners “may seek information necessary to assess the propriety of
royalty calculations from the lessee” and other sources. Id. at 737. Turning to the
facts before it, the supreme court then concluded that the royalty owners could have
sought information about the improper post-production charges, which appeared on
the royalty statements, from the lessee and from the gas purchasers. Id. (stating that
“there were several sources of information available to [the royalty owners] from
which they could have discovered the propriety of post-production charges”). In sum,
the supreme court held that because the underpayments could have been discovered
with the exercise of reasonable diligence, the royalty owners’ injury was not
inherently undiscoverable and, thus, the discovery rule did not apply. Id. 
          Similarly, in HECI, the supreme court considered the applicability of the
discovery rule to royalty owners’ claims against a lessee for breach of an implied
covenant to notify them of a potential claim against a third party for damage to a
common reservoir. 982 S.W.2d at 885. The lessee in HECI had discovered that a
third-party producer on an adjoining lease had damaged the common reservoir
through overproduction, and the lessee had filed, and eventually settled, a lawsuit
against the third party related to this damage. Id. at 884. More than four years after
the damage, the royalty owners filed suit against the lessee, alleging that the lessee
violated an implied covenant by failing to notify them of the need to sue the third
party producer. Id. In concluding that the damage to the common reservoir was not
inherently undiscoverable and that the discovery rule did not apply, the court stated
that the royalty owners “had some obligation to exercise reasonable diligence in
protecting their interests,” including exercising reasonable diligence in determining
whether a third party operators inflicted damage to the common reservoir. Id. at 886. 
The court explained that royalty owners could not remain “oblivious to the existence
of other operators in the area or the existence of a common reservoir” and noted that
“wells visible on neighboring properties may put royalty owners on inquiry.” Id. The
court also noted that “[r]ecords about operations in a common reservoir are also
generally available at the Railroad Commission.” Id. at 886–87.



           In contrast to the facts presented in Kerlin, Horwood, and HECI, the evidence
presented in this case supports the jury’s findings as to Shell’s fraudulent
concealment of its wrongful conduct and as to when the Rosses, with the exercise of
reasonable diligence, could have discovered the wrongful conduct and their claims. 
Ross’s father testified that he could not know that Shell was using an arbitrary unit
price on its royalty statements until 2002, when Scott informed him that the unit price
“was not what it should have been.” Although the evidence presented at trial showed
that the Rosses could have used available records to discover that the unit price on
the Houston and Lasater wells was lower than the unit price on their other wells, the
fact that the unit price was lower for these two wells would not have necessarily
caused a reasonably prudent person to inquire about the lower price. Graham testified
that the price of the natural gas could have been affected by the heat value, i.e., BTU,
of the gas. Although the royalty statements contained Shell’s representations about
the amount of gas produced, they did not state the BTU of the gas. Graham testified
that without knowing the BTU of the gas, an ordinary royalty owner would have no
reason to believe that the unit price is incorrect. Berghammer, Shell’s expert, also
testified that “you would need the BTU to do an accurate comparison.” 
          Accordingly, we hold that the evidence is legally sufficient to support the jury’s
finding that the Rosses should, “in the exercise of reasonable diligence, have
discovered that Shell failed to pay royalty in accordance with the Reuss Lease” for
reasons “other than the ‘weighted average/blended price’ issue” in “2002.”
           Regarding the “February 6, 2006” finding, Graham testified that, by reviewing
Shell and El Paso Natural Gas internal documents, he first discovered Shell’s use of
a weighted average price after he began working on the Ross’s case in November
2005. Plaintiff’s Exhibit 27, the billing records for Ross’s trial counsel, indicates that
the first meeting between Graham and Ross’s trial counsel occurred on February 6,
2006. In sum, unlike Kerlin, Horwood, and HECI, there is evidence in the record
from which the jury could have reasonably concluded that there were no other sources
of information from which the Rosses could have discovered (prior to the dates found
by the jury) that Shell was under paying royalties under the lease for the reasons
described above.


 
          Accordingly, we further hold that the evidence is legally sufficient to support
the jury’s finding that the Rosses should, “in the exercise of reasonable diligence,
have discovered that Shell failed to pay royalty in accordance with the Reuss Lease”
on the weighted average issue on “Feb. 6, 2006.”
          We overrule Shell’s third and fifth issues.
Constructive Notice Instruction
          In its sixth issue, Shell argues that the trial court erred in not including its
instruction on constructive notice because actual knowledge of Shell’s underpayment
of royalties “could have been acquired by examining public records.” 
          It is well-established that litigants have a right to a fair trial before a jury that
is properly instructed on the issues authorized and supported by the law governing
the case. Harris County v. Smith, 96 S.W.3d 230, 234 (Tex. 2002). It is the duty of
the trial court to submit only those questions, instructions, and definitions raised by
the pleadings and the evidence. Id. at 236; see Tex. R. Civ. P. 278. A trial court’s
refusal to submit an instruction is reversible error if it “probably caused the rendition
of an improper verdict.” Tex. R. App. P. 44.1(a)(1).
          Constructive notice creates an irrebuttable presumption of actual notice in some
circumstances. HECI Exploration Co, 982 S.W.2d at 887. In support of its argument
that the Rosses could have been found to have had constructive notice because actual
knowledge of the fraud could have been acquired by examining public records
available at the Land Office, Shell relies on Mooney v. Harlin, 622 S.W.2d 83 (Tex.
1981), and Sherman v. Sipper, 152 S.W.2d 319 (Tex. 1941). However, these cases
involve specific types of public records in specific situations. See Mooney, 622
S.W.2d at 85 (“Persons interested in an estate admitted to probate are charged with
notice of the contents of the probate records.”); Sherman, 152 S.W.2d at 321
(“Equally well settled is the rule that where a person had a right to property, and he
claims fraudulent statements were made concerning the title to such property, when
the records relating to such title are open to him he must exercise reasonable diligence
to discover such defect . . . .”). In both cases, the Court found a compelling rationale
for imposing constructive notice. HECI Exploration Co., 982 S.W.2d at 886–87. 
However, when the rationale for imposing constructive notice is lacking, public
records have not been held to create an irrebuttable presumption of notice. Id. at 887;
see Andretta v. West, 415 S.W.2d 638, 642 (Tex. 1967); see also Little v. Smith, 943
S.W.2d 414, 421 (Tex. 1997).
          Having concluded that the Rosses could not have reasonably discovered Shell’s
fraudulent concealment based on public records at the Land Office, we further
conclude that these public records did not create an irrebuttable presumption of
notice. Therefore, the proposed instruction was inapplicable to the situation
presented by the evidence in this case. Accordingly, we hold that the trial court did
not err in not submitting Shell’s proposed instruction on constructive notice.
          We overrule Shell’s sixth issue.
Conclusion
          We affirm the judgment of the trial court. 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Justices Jennings, Alcala, and Higley.
Justice Alcala, dissenting.